732 A.2d 1193

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**James O'HANNON, Appellee.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1998.

Decided June 8, 1999.

Catherine Marshall, Helen Kane, Philadelphia, for the Com.

Aaron Finestone, Philadelphia, for James O'Hannon.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION OF THE COURT

CASTILLE, Justice.

We granted allocatur in order to determine whether the prosecutor's questioning of appellee on cross-examination regarding appellee's threats against his co-conspirators was proper as tending to show consciousness of guilt, or, instead, constituted improper questioning concerning prior crimes. For the reasons stated herein, we determine that the prosecutor's questions were permissible. Accordingly, we determine that the Superior Court erred in reversing appellee's convictions.

The facts relevant to this appeal, viewed in the light most favorable to the Commonwealth as the verdict winner, are as follows: Appellee owned a roofing firm and employed four young men as laborers; Robert Reynolds, Mason Reynolds, James Scott and Tyrone Scott, the co-conspirators herein. In the early months of 1989, the co-conspirators robbed several banks and stores in Philadelphia. All four were eventually arrested and each gave statements to police implicating appellee as the ring-leader in all of the robberies.[1]

Additional circumstantial evidence linked appellee to the crimes. Specifically, on February 10, 1989, Robert Reynolds and James Scott committed an armed robbery of Germantown Savings Bank at Front and Olney Streets in Philadelphia. Mason Reynolds waited outside the bank in the escape vehicle,

---

1. Three of the co-conspirators pleaded guilty to various offenses and the fourth was prosecuted in juvenile court.

which was appellee's truck. Shortly after the robbery took place, police observed appellee speeding away from a parking spot near the rear of the bank.

On February 28, 1989, James Scott and Robert Reynolds robbed the A-plus Mini Market on Germantown Avenue in Philadelphia. Appellee waited outside in his truck in order to abet his co-conspirators' actions. The co-conspirators jumped into the truck after the robbery and appellee drove away.

On March 1, 1989, Tyrone Scott and Robert Reynolds entered the Thriftway Market at Old York Road and Lindley Street carrying appellee's gun. A struggle ensued between Scott and the security guard. Scott shot the security guard in the arm. Reynolds ran outside where appellee was waiting in his vehicle. Appellee and Reynolds drove off, leaving Scott at the scene.

Appellee was arrested and charged with various offenses. Three of the co-conspirators testified against appellee at his trial. The jury convicted appellee of three counts of robbery,[2] three counts of criminal conspiracy,[3] and one count of aggravated assault.[4]

Appellee appealed to the Superior Court, and claimed that the trial court should have granted a mistrial when the prosecutor asked him during cross-examination if he had threatened his co-conspirators in order to prevent them from implicating him in the crimes. The Superior Court reversed and remanded, determining that the prosecutor's cross-examination of appellee as to whether he had threatened his co-conspirators was prejudicial evidence of prior crimes.[5] We disagree.

2. 18 Pa.C.S. § 3701.

3. 18 Pa.C.S. § 903.

4. 18 Pa.C.S. § 2702.

5. The Superior Court panel was divided. Judge Popovich drafted the opinion, to which Judge McEwen concurred in the result and Judge Olszewski noted his dissent.

At issue is the following cross-examination of appellee by the prosecutor: [6]

Q [Prosecutor]: And isn't it true that you threatened these young men into not testifying against you, you threatened them from the very beginning that you would get them if they testified against you? Isn't that what did you [sic] from the beginning with these three individuals, sir?

A [Appellant]: No, I didn't. Incorrect.

Q: And isn't that why Mason Reynolds is scared to death of you, sir, because you've threatened him?

**Defense**: Objection, Your Honor.

Q: Because you threatened to kill him?

**6.** Appellee does not claim that the prosecutor lacked a good faith basis for this line of questioning and made no objection on the basis of lack of foundation. As the record reflects, there was ample evidence suggesting that threats had been made. A detective who took a statement from Robert Reynolds testified that Reynolds was afraid to answer certain questions. N.T. 3/8/93 at 55. Another detective to whom Reynolds gave a statement testified that Reynolds was very reluctant to mention appellee's name because Reynolds was afraid that appellee would "have them taken care of." N.T. 3/8/93 at 95. Mason Reynolds told an FBI agent that appellee was involved in the crimes, but later informed appellee's attorney that appellee was not involved. Reynolds denied appellee's involvement only after speaking to appellee on the phone. N.T. 3/4/93 at 212–215. On redirect, the following exchange took place between the prosecutor and Mason Reynolds:

> Q: Well, why did you tell [appellee's attorney] he had nothing to do with it?
> A: I just told him that.
> Q: Well, I am saying when you spoke to [appellee's attorney], was that the truth?
> A: No, it wasn't the truth.
> Q: Why wasn't it the truth?
> A: Well, he asked me, and I said, you ain't have nothing [sic] to do with it.
> Q: Why did you say that, if it wasn't true?
> A: I was scared at the time.
> Q: What were you scared of?
> A: Mr. O'Hannon.
> Q: Why were you scared? Tell the Ladies and Gentlemen of the Jury why you were scared of Mr. O'Hannon? Tell these Ladies and Gentlemen why?
> A: Because I was young.
> [By defense counsel]: What?
> [By the prosecutor]: Because he was young.

260

**Defense:** Objection, Judge. Judge, can we see you at sidebar?

**The Court:** No.

**Defense:** Very well.

**The Court:** Questions are not evidence. It's the answers that are the evidence. And I told this jury that and I'll tell them again.

Q: Isn't it true that you threatened to kill Mason Reynolds if he cooperated and testified against you, sir?

A: That's an outright lie.

Q: And isn't it true that you paid him? You got him some money while he was in prison, sir, to attempt to bribe him to not come down here and testify against you at any hearings. Isn't that the truth sir?

A: That's an outright lie.

Q: You never had contact with him. You never gave him any money, sir?

A: I never had no contact with them. They called me at home from prison telling me they were sorry. Not only did they call me, they called my lawyers and gave confessions. They called my dad, asked my dad, which is my pastor and my bishop [sic]. He called and was very apologetic talking to him. They called me all the time. I don't have a direct line to the prison.

Q: That's because they called collect and you accepted the charges. Because they were scared of you, weren't they? That's why they called you; isn't it correct, Mr. O'Hannon? They were scared that you would come and get them in prison and you told them that. You told them that you would get them in prison. Isn't that what you told them?

A: If I have a hold on somebody like that, then I'm doing real good. No. That's an outright lie.

Q: Sir, did you hear the statements that were read by Robert Reynolds when he testified that I don't want to put

[By the witness]: I was scared that he might do something to me. N.T. 3/4/93 at 214–15.

nobody's name down because he was putting our lives in jeopardy? Did you hear that testimony, sir?

A: Yes, I did.

Q: Why would he say that about you?

**Defense:** Objection, Judge.

**The Court:** Overruled.

Q: Why would he say that about you, Mr. O'Hannon?

**Defense:** Objection, judge. He doesn't know it's about him.

**The Court:** Yes. Sustained.

Q: Sir, do you have any idea why he would say, you know who it is, I'm not saying his name? Any idea why he would say that, sir?

A: No. I really don't. I really don't. But I have my suspicions.

Q: Okay. And, sir, in regard to those three individuals, you never threatened them, sir?

A: That's an outright lie. No. No.

N.T. Trial, 3/9/93 at 101–104.

The Superior Court held that the trial court erred in allowing this line of questioning because it constituted an admission of *evidence* of appellee's prior crimes. However, we fail to see how this discourse was tantamount to the admission of evidence of appellee's prior crimes. Rather, the prosecutor, based on other evidence, made inquiries of appellee concerning whether appellee had made such threats. Appellee denied making any threats. Thus, no evidence of prior bad acts was admitted.

 The scope of cross-examination lies largely within the discretion of the trial court, whose ruling will not be reversed absent a clear abuse of discretion or error of law. *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1095 (1998).[7] Furthermore, it is well established that attor-

---

**7.** We note that in its opinion in this matter, the Superior Court makes no mention of the proper standard of review. It appears however, that

ney's questions and statements are not evidence. *Commonwealth v. LaCava*, 542 Pa. 160, 181–82, 666 A.2d 221, 231 (1995).

■ Here, following appellee's objections to the prosecutor's questions, the trial court explicitly stated:

> **The Court:** Questions are not evidence. It's the answers that are the evidence. And I told this jury that and I'll tell them again.

N.T. Trial, 3/9/93 at 102. Thus, the trial court made clear to the jury that the references to the alleged threats could not be used as evidence against appellee. The trial court made this statement in a timely fashion, immediately after appellee's objections to the prosecutor's questions. In addition, during final jury instructions, the trial court instructed the jury as follows:

> **The Court:** During the course of this case, the Commonwealth, during the cross-examination of the defendant, alluded to statement's allegedly made by the defendant. You might recall there were questions asked, isn't it a fact that you told so and so, thus and so? You may not consider those statements as evidence against the defendant, unless you find that the defendant made the statements. Obviously, words allegedly written or spoken, by a defendant, should not be used against him unless he actually uttered those words. Only so much of a statement actually made by the defendant, may be considered as evidence against him, to be judged for the truthfulness and weight, along with other evidence in this case, to determine whether he has been proven guilty.

N.T. Trial, 3/10/93 at 26. Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions. *LaCava*, at 182, 666 A.2d at 231.

The Superior Court additionally found that the trial court erred for failing to indicate immediately to the jury that any references to prior bad acts could not be used as evidence of

the Superior Court employed a *de novo* standard as opposed to merely reviewing for an abuse of discretion.

guilt. However, the Superior Court overlooks the fact that no evidence of prior bad acts was actually admitted. Rather, the prosecutor merely questioned appellee, and appellee denied making any threats. Accordingly, no such instruction was necessary.

For the aforementioned reasons, we reverse the decision of the Superior Court which reversed appellee's convictions. Jurisdiction is relinquished.

Justice SAYLOR concurs in the result.

Justice ZAPPALA dissents.