J-S12019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| CHAUNCEY ELLISON, | |
| Appellant | No. 747 EDA 2014 |

Appeal from the Judgment of Sentence entered January 17, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0008805-2012

BEFORE:  BOWES, SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY SHOGAN, J.:                    **FILED MARCH 11, 2015**

Appellant, Chauncey Ellison, appeals from the judgment of sentence entered following his conviction of recklessly endangering another person ("REAP").  We affirm.

Following a jury trial that commenced on November 18, 2013, and concluded on November 22, 2013, Appellant was convicted of REAP.  He was found not guilty of possession of an instrument of crime and criminal conspiracy.  The jury was deadlocked on the remaining charge of voluntary manslaughter, which was ultimately *nol prossed* by the Commonwealth on January 29, 2014.

_____

[*]  Former Justice specially assigned to the Superior Court.

On January 17, 2014, Appellant was sentenced to eleven and one-half to twenty-three months of imprisonment, followed by one month of probation. Appellant filed post-sentence motions which were denied on February 21, 2014. On March 4, 2014, Appellant filed his notice of appeal. Appellant and the trial court complied with Pa.R.A.P. 1925.

The trial court provided the following thorough statement of facts:

> On the evening of Monday, November 17, 2008, [Appellant] and co-defendant Robin Fortune, his then-girlfriend, were inside Fortune's home when their fourteen-year-old sons went out to buy pizza. When the two boys returned home, they informed [Appellant] and Fortune that they had been robbed at the pizza shop. Stephon Berry, Robin Fortune's son, was trembling in fear, and Chauncey Ellison, Jr., [Appellant's] son, had a bruise on his head. N.T. 11/21/13, pp. 78- 79, 94-95, 126-128, 140, 178-180.
>
> At the time, [Appellant] and Fortune were Philadelphia police officers, but both were off duty on that evening. Instead of calling 911 and reporting the crime, [Appellant] and Fortune decided to search for the robber on their own. Neither [Appellant] nor Fortune was in police uniform nor did either have official police department identification on their person when they entered [Appellant's] SUV and began their search for the robber. However, [Appellant] was armed with his service weapon. [Appellant's] son, Chauncey Ellison, Jr., and Fortune's sixteen-year-old daughter, Brittany Fortune, accompanied them on their search. Stephon Berry, Fortune's son, remained at home. N.T. 11/21/13, pp. 94, 99, 126, 139-144, 178-180.
>
> [Appellant] began the search by driving toward the Cheltenham Mall along Cheltenham Avenue. When they were near the mall parking lot, [Appellant's] son identified a man wearing an orange hoodie as the individual who robbed and assaulted him. This man was later identified as sixteen-year-old Demetrius Haywood, who was walking with his friend, nineteen-year-old Lawrence Allen, the decedent. Haywood and Allen were returning to Renova Street after having bought snacks from a nearby delicatessen. Decedent lived at 1982 Renova Street with

- 2 -

his girlfriend, Rosemily Rosado, his two children, his sisters, Louren Allen and Mecca Drake, and their children. N.T. 11/19/13, pp. 73-76; N.T. 11/21/13, pp. 49-54, 80-83, 128-130, 180-183.

Upon observing Haywood and Allen, [Appellant] drove slowly toward the two men and stopped his SUV in the middle of the mall parking lot. [Appellant], Fortune and her daughter exited the vehicle. [Appellant] unholstered his gun as he approached Haywood and Allen. However, neither [Appellant] nor co-Defendant Fortune identified themselves as police officers. Haywood and Allen both ran across Cheltenham Avenue in opposite directions. [Appellant] attempted to chase the two men, but lost sight of them after they crossed the street. [Appellant] returned to his vehicle and learned that Fortune and her daughter had chased Haywood, who ran into a driveway. When Fortune and her daughter reached the end of that driveway, they lost Haywood. [Appellant], Fortune and her daughter all re-entered [Appellant's] vehicle and they continued their search. N.T. 11/19/13, pp. 81-84; N.T. 11/21/13, pp. 55-58, 83-86, 129-132,180-183.

[Appellant] then drove to 20th Street and Cheltenham Avenue. When he turned from 20th Street onto Renova Street, [Appellant] was driving in the wrong direction on this one-way residential street. After turning onto Renova Street, with his gun pointed out of the window of his SUV, [Appellant] again saw Haywood who was still running away. Upon observing [Appellant], Haywood reversed his direction and ran back down the street. [Appellant] then stopped, and he and Fortune exited the vehicle. Co-Defendant Fortune then started screaming up the block at Haywood: "Yeah. You like robbing people. We'll be down there. We'll be down there." N.T. 11/19/13, pp. 77-80; N.T. 11/21/13, pp. 58-60, 84-87, 131-132, 146-148, 182-183.

When [Appellant] and Fortune exited the SUV, Allen approached them and said: "Yo! What's going on? You out here pulling guns endangering my son." At that time, Allen's son was inside the house looking outside the window. Allen said: "What's the problem? .... If it was about the pizza, I give you all the money back." While [Appellant] and Fortune were confronting Allen outside, Haywood ran past [Appellant's] SUV and into Allen's house, where he informed Allen's girlfriend and two sisters that he had assaulted and robbed a boy at the pizza

shop. He further informed them that Allen was involved in an altercation with the boy's father outside. Haywood then hid inside Allen's garage and the women went outside. When the two women got outside, Fortune was screaming and cursing loudly: "You all don't know who the fuck you're dealing with. You all going to learn today, you pussies." She was also yelling to [Appellant]: "You going to let this happen? You going to let him do that to your son? .... You going to let one of these MF'ers push you around? Go ahead and pop one of these MF'ers. Pop those pussies." At one point, Allen reached inside his pocket and pulled out money and offered to pay for the pizza. [Appellant] refused the offer and Allen grabbed his girlfriend's hand and turned to go inside his house. [Appellant] then reached over Allen's girlfriend and shot Allen once in the back. This shooting occurred at or around 9:00 p.m. N.T. 1 1/1 9/13, pp. 74-92; N.T. 11/20/13, pp. 60-69, 92-106; N.T. 11/21/13, pp. 57-62.

After the gunshot, Allen collapsed on the ground and started coughing up blood. Allen's friend, Sybari Laws, drove him in a Cadillac Deville to Albert Einstein Hospital in Montgomery County. Allen's girlfriend and other unnamed individuals rode with them. Allen had been shot in the upper left portion of his back. The bullet went from left to right in the vertebra and lodged in the fourth thoracic. The bullet fractured the back part of his rib and caused bleeding in his chest cavity. In addition to paralysis, Allen suffered several other complications from his gunshot wound including bedsores, infection, pneumonia, and blood clots in his leg, which developed into a pulmonary embolism while he was in the hospital. N.T. 11/20/13, pp. 28-35, 101-103.

Allen remained in the hospital until February 13, 2009, when he was transferred to Moss Rehab after being found in stable condition. While in Moss Rehab for only a few hours, Allen developed a high fever. As a result, he returned to the hospital, where he was diagnosed with a severe urinary tract infection. Lawrence Allen died in Einstein Hospital on February 15, 2009. Dr. Samuel Gulino, Chief of the Office of the Medical Examiner, testified at trial as the Commonwealth's expert in forensic pathology. Dr. Gulino concluded to a reasonable degree of medical certainty that Allen's death was caused by a urinary tract infection with sepsis, one of the medical complications he suffered as a result of the gunshot wound to his back. N.T. 11/20/13, pp. 28-35.

Immediately after Allen was shot, [Appellant] and Fortune returned to his SUV and left the scene. When they reached the area near 21st Street and Cheltenham Avenue, there was a Cheltenham police officer conducting a traffic stop. Co-Defendant Fortune exited the SUV and ran to the police officer. It was approximately 9:15 p.m. when Fortune approached Cheltenham Police Officer Brian Walsh and informed him that [Appellant] had shot someone. When Officer Walsh approached the SUV, [Appellant] was in the driver's seat and the two teenagers were in the back passenger seats. Officer Walsh observed a gun on the center console and secured it for his safety. When he asked [Appellant] if he had been involved in a shooting, [Appellant] answered in the affirmative. Officer Walsh probed further, and he learned that [Appellant's] son had been robbed, that [Appellant] had found the robber, and that [Appellant] shot a man who had come to the robber's assistance. Officer Walsh then advised his dispatcher that off-duty Philadelphia police officers had been involved in a shooting. Within a minute, Officer Walsh turned over [Appellant's] service weapon to a Philadelphia police officer who arrived on the scene. N.T. 11/19/13, pp. 110-122; N.T. 11/21/13, pp. 135-136, 185-188.

Lieutenants Jack Feinman and David Van arrived on the scene and transported [Appellant] to Internal Affairs, where Lieutenant Michael Young inventoried the Glock pistol, an official city-issued weapon, and seventeen (17) [9 mm] cartridges. Lieutenant Young also determined that [Appellant] did not have anything on his person that identified him as a police officer. [Appellant] was then authorized to receive a replacement weapon. He was also informed that he was assigned to desk duty while Internal Affairs conducted an investigation.

Trial Court Opinion, 7/17/14, at 2-6.

Appellant presents the following issues for our review:

Did the trial court err in denying Appellant's motion for mistrial made in response to the Commonwealth improperly questioning Appellant on a matter that the court had specifically ordered all parties not to introduce at trial?

Was the evidence presented by the Commonwealth at trial sufficient as a matter of law to convict him of recklessly endangering another person?

Appellant's Brief at 2 (full capitalization omitted).

Appellant first argues that the trial court erred in denying Appellant's motion for a mistrial made in response to the Commonwealth's question to Appellant asking whether he had been fired from his job as a police officer. Appellant's Brief at 12. Appellant asserts that the question was asked in contravention of the trial court's earlier ruling that no such questions would be permitted. *Id.* Appellant further argues that the "fairness of Appellant's trial was irreparably compromised as a consequence of this misconduct, the [trial court] should have granted a mistrial and the cautionary instruction presented to the jury failed to sufficiently alleviate the prejudicial affect that it had." *Id.*

Our Supreme Court has set forth the following standard for reviewing the denial of a motion for mistrial:

> It is well-settled that the review of a trial court's denial of a motion for a mistrial is limited to determining whether the trial court abused its discretion. "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . . discretion is abused." A trial court may grant a mistrial only "where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." A mistrial is not necessary where cautionary instructions are adequate to overcome prejudice.

***Commonwealth v. Chamberlain***, 30 A.3d 381, 422 (Pa. 2011) (internal citations omitted)

Prior to trial, the Commonwealth filed a motion *in limine*. In support of its motion *in limine*, the Commonwealth explained that initially the district attorney's office, after reviewing information submitted by the police department, made a decision to not charge Appellant. N.T., 11/18/13, at 10. Ultimately, however, a grand jury was convened and charges were brought against Appellant and the co-defendant. ***Id.*** The Commonwealth further stated that the police department ultimately discharged Appellant for "other reasons of their own." ***Id.*** As a result, the Commonwealth sought to preclude reference being made during trial to the fact that the district attorney's office and the police department had cleared Appellant and co-defendant of the criminal charges. ***Id.***

During this exchange, co-defendant's counsel also sought to preclude any mention of the fact that a grand jury had indicted Appellant and co-defendant. N.T., 11/18/13, at 11. The Commonwealth further stated it would also "move *in limine* the fact that [Appellant and the co-defendant] had been fired by the police department." ***Id.*** In response, however, defense counsel raised a concern and stated: "Depending on how the case goes, there may be an argument as to whether or not that comes in or not." ***Id.*** Following a brief discussion of this issue, the trial court stated: "If it becomes relevant, let me know before you introduce it. I will not preclude

anyone from doing what he or she thinks is appropriate to get a fair trial. Let's not bring in extraneous and irrelevant material." *Id.* at 12-13.

On the morning of trial, co-defendant's counsel made a motion *in limine* seeking to exclude testimony regarding internal police directives. N.T., 11/19/13, at 9. The Commonwealth responded that such directives may become relevant during trial depending on the defense developed. *Id.* at 12. Instead of ruling on the motion at that time, the trial court indicated that it would rule on that issue if it arose. *Id.* at 14.

With those rulings in mind, we review the questioning contested by Appellant. During cross-examination, the Commonwealth questioned Appellant about a police department directive that directed off-duty officers "to be a good witness and call 911." N.T., 11/21/13, at 191. Co-Defendant's counsel objected, but the trial court overruled that objection. *Id.* Appellant explained that, while at that time there was no directive, there was in fact a commissioner's memorandum, dated 1998, that was in effect that advised that "the best course of action is to call 911." *Id.* at 191-192. The Commonwealth further questioned Appellant regarding these directives and the following exchange took place:

> [ADA]: There is also a directive that says police officers should ensure that their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive and improper actions, correct?
>
> [Co-Defendant's Counsel]: Objection.

[Trial Court]:     Overruled.

[Appellant]:     It does say that, but was it also noted in this case that I was justified by the Philadelphia Police Department in the use of deadly force.

[ADA]:     You were justified in your head --

[Appellant]:     No, on paper, that the Philadelphia Police Department determined that in this incident that I was justified in the use of deadly force.

     You bringing up the directives and --

[ADA]:     Is that before or after you were fired for violating the directives?

[Appellant]:     Before.  I was justified right after the incident.

N.T., 11/21/13, at 193.

Following this exchange and outside of the hearing of the jury, Appellant's counsel objected to the Commonwealth's reference to Appellant being fired and he moved for a mistrial on this basis.  N.T., 11/21/13, at 193-194.  The Commonwealth argued that the directives were relevant to establish Appellant's state of mind and the behavior expected of police officers.  *Id.* at 197.  The Commonwealth further asserted that by responding to its questions regarding the directives with the fact that the Philadelphia police department determined that he was justified in his actions, Appellant "opened the door" to facts related to his termination.  *Id.* at 198.

As noted, the trial court did not rule on the motion to preclude reference to department directives but instead, stated that it would address

such issues as they arose, if at all, during trial. Thus, the Commonwealth did not violate the trial court's ruling by asking Appellant questions regarding department directives. Counsel objected to the question, and the trial court overruled the objection. Thus, we cannot agree that the Commonwealth improperly questioned Appellant regarding this material.

Moreover, instead of responding to the Commonwealth's question about the departmental directive, Appellant responded that the police department had found that "he was justified" in his actions. Appellant therefore raised the issue of departmental action that the parties and the trial court had previously addressed in the motion *in limine* and had decided would be irrelevant and immaterial to the proceedings. Because Appellant opened the door to the police department's previous action of finding Appellant's actions justified, the Commonwealth was within its rights to reference the police department's additional and subsequent action of firing Appellant. "Having 'opened the door' to this subject, [A]ppellant cannot now complain because the prosecutor chose to further comment on what was behind that door." **Commonwealth v. Hawkins**, 701 A.2d 492, 503 (Pa. 1997).

Furthermore, based on the testimony provided, the jury heard information that was supportive of both Appellant's and the Commonwealth's case. Before these statements were expounded upon, the testimony was interrupted. Therefore, we do not conclude that the Commonwealth's

questioning had the unavoidable effect of prejudicing the jury so as to warrant a mistrial. *See Commonwealth v. Begley*, 780 A.2d 605, 624 (Pa. 2001) ("The remedy of a mistrial is an extreme one that is required only when an incident is of such a nature that its unavoidable effect is to deprive the defendant of a fair and impartial trial by preventing the jury from weighing and rendering a true verdict.") As a result, we cannot agree with Appellant's argument that the Commonwealth's reference to Appellant being fired so prejudiced Appellant that the trial court was required to grant a mistrial.

Furthermore, following the objection and motion for mistrial, the trial court crafted a curative jury instruction. The trial court provided the following instruction to the jury:

> Ladies and gentlemen, you have heard testimony during the course of this trial that these two defendants were both off duty police officers at the time of the incident which gave rise to the charges which are the subject of this trial.
>
> In the course of the testimony adduced thus far, there was testimony about police directives and there was testimony about whether the shooting was deemed justified by the police department and there was testimony about whether [Appellant] was fired as a result of his actions.
>
> Ultimately, ladies and gentlemen, none of that is relevant to your inquiry as to whether or not a crime or crimes were committed.
>
> That is a determination that you must make as jurors based on the evidence you hear during the course of this trial and the law which I will instruct you [sic] at the conclusion of the evidence.

- 11 -

> Accordingly, members of the jury, I instruct you to disregard any question or answer or testimony about police directives, about departmental clearance and/or termination of employment.
>
> Your decision in these cases must be based upon the facts and the law of this case and nothing else.

N.T., 11/21/13, at 201-202.

Accordingly, the trial court's contemporaneous instruction cured any prejudice that may have been imparted by the Commonwealth's reference to Appellant's termination. Our Supreme Court has held that a mistrial is unnecessary where cautionary instructions are sufficient to overcome any possible prejudice. *Begley*, 780 A.2d at 624. Furthermore, "absent evidence to the contrary, the jury is presumed to have followed the court's instructions." *Commonwealth v. Huggins*, 68 A.3d 962, 974 (Pa. Super. 2013) (quoting *Commonwealth v. O'Hannon*, 732 A.2d 1193, 1196 (Pa. 1999)). Because the cautionary instruction was sufficient to overcome any possible prejudice and there is no evidence that the jury did not follow the court's instructions, the trial court did not abuse its discretion in denying the motion for a mistrial. Thus, this claim does not afford Appellant relief.

In his second issue, Appellant maintains that the evidence presented by the Commonwealth was insufficient as a matter of law to convict him of REAP. Appellant's Brief at 18. Specifically, Appellant argues that the evidence fails to support the trial court's conclusion that Appellant acted

recklessly. *Id.* at 21. As a result, Appellant asks this Court to overturn his conviction for REAP. *Id.* at 23.

Our standard for reviewing the sufficiency of evidence on appeal is as follows:

> The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Bricker*, 41 A.3d 872, 877 (Pa. Super. 2012) (citations and quotations omitted).

The crime of REAP is defined at 18 Pa.C.S. § 2705 as follows: "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." We have held that a person is guilty of this crime when it is shown that the person (1) possessed "a *mens rea* recklessness," (2) committed a wrongful deed or guilty act ("*actus reus*"),

and (3) created by such wrongful deed the danger of death or serious bodily injury to another person. ***Commonwealth v. Emler***, 903 A.2d 1273, 1278 (Pa. Super. 2006).

"Recklessly" is defined as follows:

A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b)(3). Furthermore, 18 Pa.C.S. § 2301 defines "serious bodily injury" as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ."

The trial court provided the following summation of evidence presented at trial that supports Appellant's conviction of REAP:

Clearly, [Appellant] consciously disregarded an unjustified and extremely high risk that brandishing and firing his weapon would cause serious bodily injury or death. In the first instance, [Appellant] was reckless for pursuing the individual who robbed his son while in plain clothes and armed with a firearm while off duty without identifying himself as a police officer. The more reasonable course of action would have been to call 911 and report the crime when they learned of the robbery. However, instead of acting in a reasonable manner, [Appellant] pursued the robber and placed numerous lives in great risk of danger. When [Appellant] arrived on Renova Street in his continued pursuit of the robber, he pointed his gun out of the window as he sped up the street in the wrong direction while there were several individuals outside and children inside Allen's house nearby.

- 14 -

Despite Allen's repeated offers to pay for the stolen pizza, the confrontation continued to escalate with Fortune urging [Appellant] to "shoot the MFers." [Appellant] shot Allen in the back even after the decedent had begun to retreat from the brawl. This shooting led to Allen's severe injuries and ultimate death. Certainly [Appellant's] actions grossly deviated from the standard of conduct that a reasonable person would observe under these circumstances. The aforementioned facts clearly demonstrate that [Appellant] acted recklessly during this incident and that he consciously disregarded an unjustified and extremely high risk that injury and death could result from his conduct. Based on these facts, the Commonwealth proved beyond a reasonable doubt that [Appellant] was guilty of recklessly endangering another person. Therefore, there was sufficient evidence to convict [Appellant] of this offense.

Trial Court Opinion, 7/17/14, at 15-16.

The evidence of record supports the trial court's summary and analysis. Viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, the record reflects sufficient evidence to establish beyond a reasonable doubt Appellant's conviction of REAP. Thus, Appellant's second claim fails.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/11/2015

- 15 -