J-S35011-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KAMAU CRANKFIELD | : | |
| | : | |
| Appellant | : | No. 412 MDA 2021 |

Appeal from the Judgment of Sentence Entered February 4, 2021
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0002898-2018

BEFORE:   OLSON, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED MARCH 25, 2022**

Appellant, Kamau Cranfield, appeals from the judgment of sentence entered on February 4, 2021 in the Criminal Division of the Court of Common Pleas of Dauphin County, as made final by the order denying his timely post-sentence motion entered on March 9, 2021.   We affirm.

On or around May 21, 2018, Appellant and his co-defendant, Tekicia Jones,[1] (hereinafter "Ms. Jones") were charged with:   (1) aggravated

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] At a separate trial court docket, Ms. Jones, on May 4, 2021, pleaded guilty to one count of endangering the welfare of children, amended to a misdemeanor of the first degree.  She received a sentence of five years' restrictive probation with the first six months to be served on electronic monitoring and house arrest.

assault - victim less than 13 and defendant 18 or older;[2] (2) simple assault;[3] and (3) endangering the welfare of children – parent/guardian/other commits offense ("EWOC").[4] At the conclusion of trial on October 26, 2020, a jury found Appellant guilty of EWOC and not guilty of the remaining offenses. Additionally, the jury found that Appellant engaged in a course of conduct that created a substantial risk of death or serious bodily injury. Accordingly, Appellant's EWOC conviction was graded as a second-degree felony. Sentencing was deferred for completion of a pre-sentence investigation report.

On February 4, 2021, Appellant received a sentence of five to 10 years' incarceration in a state correctional institution. In addition, the court ordered Appellant to have no contact, direct or indirect, with the victim or the victim's family. Appellant filed a timely post-sentence motion, which the trial court denied on March 9, 2021. Thereafter, Appellant lodged a timely notice of appeal on April 5, 2021. Pursuant to court order, Appellant filed a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal on April 24, 2021.

---

[2] 18 Pa.C.S.A. § 2702(a)(9).

[3] 18 Pa.C.S.A. § 2701(a)(1).

[4] 18 Pa.C.S.A. § 4304(a)(1).

The trial court summarized the relevant evidence adduced at trial as follows.

> On May 18, 2018, Debra Shepler (hereinafter "Ms. Shepler") saw on the news that an eight (8) year old female child had run away from Melrose School in Harrisburg, Pennsylvania. Ms. Shepler watched the news at 12:00 p.m., 5:00 or 6:00 p.m., and again at 11:00 p.m. before going to bed and was very concerned that the missing child had not been found. She did not recall if there was a photograph of the missing child shown on the news. She resides [along] Market Street in the Bellevue Park area [of Harrisburg, Pennsylvania], which is a straight shot to Berryhill Street where Melrose School is located.
>
> At approximately 3:45 a.m. on May 19, 2018, Ms. Shepler awoke and decided to watch television downstairs as her husband was out of town. While in the living room Ms. Shepler heard a noise coming from the kitchen and got up to see what caused it. When she walked into the kitchen, she noticed that the screen door was open and heard what she believed was scratching on the back door. She looked out of her window and saw the top of a child's head; the child was cold, wet, and looked terrified. The child begged to come inside, promising not to cause any harm, but begged for Ms. Shepler not to call the police or anyone else. Ms. Shepler asked the child if she was the one who ran away from school, and the child responded she was not.
>
> Prior to letting the child inside, Ms. Shepler called 911. Once inside, Ms. Shepler asked the child why she had run away, and the child held out her hands and responded that "he hurt me." Ms. Shepler did not notice anything apparent on the child's hands. Before Ms. Shepler was able to get the child out of her wet clothes, Office John Rosinski (hereinafter "Officer Rosinski") of the City of Harrisburg Police Department arrived at the back door. The child freaked out upon seeing Office Rosinski, ran into the bathroom and held the door shut. Ms. Shepler said that the child was hysterical - upset and terrified by the presence of a police officer.
>
> Officer Rosinski was working the overnight shift on May 19, 2018, when he was dispatched to [Ms. Shepler's residence] at 4:35 a.m. for a report of a child knocking on a back door. At roll call before his shift, Officer Rosinski was informed that there was a missing

- 3 -

eight (8) year-old female child, D.J. ([born January, 2010]), who had run away from Melrose School, and was shown a photograph. Upon arriving at [Ms. Shepler's] residence[, O]fficer Rosinski immediately went to the back door based on the information he had from dispatch. There was no one there. When he looked inside, he saw D.J. dart into the bathroom and close the door. Officer Rosinski knocked on the door and Ms. Shepler let him inside. Together, they tried to open the bathroom door, and after a little effort, Officer Rosinski was able to pull the door open and saw D.J. standing in the bathroom. He stated that the child appeared dirty, scared, and was only wearing a shirt and pants, no shoes. She was terrified and every time Officer Rosinski stepped toward her, she took a step back. Officer Rosinski then knelt on his knee to be on her eye level, which made her more comfortable. Officer Rosinski said he was there to help her and "[s]he immediately said, Please don't take me home. … My parents hurt me. I don't want to go home." Officer Rosinski and Ms. Shepler covered D.J. up with blankets because she was shivering and cold.

Once the ambulance arrived, D.J. was provided medical treatment for a mild case of hypothermia and taken to Harrisburg Hospital. While at the hospital, Officer Rosinski first noticed that the child had injuries and bruising to her legs. Based on his observations of the injuries, he called for a detective.

Officer Erik Henry (hereinafter "Officer Henry") of the City of Harrisburg Police Department was dispatched to Harrisburg Hospital to collect D.J.'s clothing, as well as take photographs of her injuries. He met the ambulance outside as D.J. was being transported to the emergency room and secured the clothing from the ambulance. He testified that the clothes were wet; therefore, he placed them in a secured drying locker at the police station. Once the clothing was dry, Officer Henry packaged the clothing and placed it into evidence. He testified that the child was wearing black pants that had a small break in the area of the right knee, but were otherwise intact. The black tights the child was wearing underneath her pants were also intact.

Detective Ryan Fetzer (hereinafter "Detective Fetzer") of the City of Harrisburg Police Department responded to Harrisburg Hospital around 9:30 a.m. on May 19, 2018. While there, he conducted a minimal fact interview of D.J. to determine whether a crime had

been committed.[5]  D.J. stated that she ran away from school because [Appellant] was going to come there, and she did not want to go home because she would be "whooped."  Based on her statements, Detective Fetzer felt it was necessary to have her undergo an emergency [CRC] interview.  After the interview was completed, Detective Fetzer filed charges against [Appellant], as well as D.J.'s mother, [Tekicia] Jones.

Amber Hess (hereinafter "Ms. Hess") is a caseworker at Dauphin County Children and Youth Services ("DCCYS") and was assigned to this case[.]  Once assigned, Ms. Hess accompanied D.J. to the CRC for a medical appointment since an emergency CRC forensic interview had already been completed at the hospital.  While at the medical appointment on May 22, 2018, Ms. Hess took photographs of D.J.'s injuries.

Ms. Hess testified that D.J. had multiple injuries all over her body.  D.J. said that she was hit with a belt on her upper arm; therefore, Ms. Hess took photographs of her upper arm showing a loop mark pattern and bruising.  On her upper thigh, D.J. had multiple loop patterns, different scarring patterns, linear marks, and broken skin.  On the back of her thigh, D.J. had linear patterns, loop patterns and broken skin.  D.J. showed the injuries on her cheek to Ms. Hess; therefore, Ms. Hess took photographs of the area showing scarring, loop patterns and linear patterns on one side of her face.  D.J. had broken skin and bruising on her shin, as well as marks on her collarbone.  There were no injuries to D.J.'s buttocks.

During the investigation, Ms. Hess was not provided an explanation for the scarring and bruising, nor did Ms. Jones indicate that the child suffered from any medical condition that would explain the injuries.  Additionally, D.J. stated that she was hit with a spatula on her hand which caused it to bleed. D.J. also stated that she was hit by both Ms. Jones and [Appellant] with a spatula and a belt.

Mary Twomey (hereinafter "Ms. Twomey") is a nurse practitioner employed by UPMC Pinnacle and conducts medical evaluations of children at the CRC.  On May 22, 2018, Ms. Twomey performed a

_____

[5] Detective Fetzer typically reserves longer interrogations for the Children's Resource Center ("CRC").

medical evaluation of D.J. at the CRC. She first reviewed the emergency room records and noted D.J. was 4'7" tall and weighed sixty-eight (68) pounds, and that she had been treated for mild hypothermia. Overall, Ms. Twomey testified that D.J. had multiple pattern bruises and abrasions to the face, arms and legs. She testified that pattern bruises typically mimic the object that was used because when the object strikes the child, "the dermal capillaries rupture at the margins of the object used to strike the child." Additionally, D.J. had broken skin around the pattern which indicates that she was struck with a force that was high impact and high velocity. Ms. Twomey testified that there were so many pattern injuries on D.J. that she did not see the value in attempting to count the number of them. D.J. had several annular bruises, two linear scars, and multiple loop marks on her arm. She also had a loop mark on her face, consistent with being struck in the face with a belt. D.J. had broken skin on her collarbone which suggested that she was struck at least three (3) separate and distinct times. Ms. Twomey testified that D.J. had multiple pattern injuries in the form of loop marks on her left lateral thigh that all blended together, which made it difficult to count the number of strikes. The injuries on D.J.'s thigh indicate that she was most likely not wearing any clothing when she was struck. Additionally, the back of D.J.s thigh had open wounds and numerous loop marks.

In summary, Ms. Twomey testified that D.J. was "beaten in the front and back . . . high and low . . . those kinds of injuries are very seldom the result of accidental trauma." Specifically, she testified that D.J.'s injuries were consistent with a history of child abuse and not corporal punishment. Ms. Twomey explained that corporal punishment is discipline inflicted over clothed buttocks with an open hand leaving behind no injuries or impairment. Conversely, abuse is any discipline that causes an injury to the child.

In her expert opinion, D.J. would have suffered a lot of discomfort and significant pain, as well as an increased risk of infection from the open wounds. In addition to the physical pain, it would be degrading and demoralizing for D.J., an eight (8) year old girl, to be beaten without clothes on. None of the injuries were on D.J.'s buttocks - they were very close, but mostly in the thigh region. Ms. Twomey was not provided with any medical explanation for the injuries.

At trial, D.J. testified via a two-way video conference system (Windstream). Prior to May 18, 2018, D.J. resided with her mother, brother, [Appellant] (mother's boyfriend), and occasionally [Appellant's] son. She testified that [Appellant] had resided with her for about two (2) to three (3) years. However, D.J. did not consider him a stepfather because he was not nice.

On the morning of May 18, 2018, D.J. packed extra clothes in her backpack before going to school because she was tired of living at her home and she wanted to run away. During class, a teacher asked D.J. for her homework, and when D.J. said 'no', the teacher opened her backpack and saw the extra clothes inside. D.J. tried to explain that she brought the extra clothes because she had urinated on herself, but that was a lie and she just wanted to run away. The teacher then said they were going to call home about the extra clothes and that is when D.J. ran out of the class and subsequently the school.

D.J. testified that she heard police looking for someone, but was afraid to come out because she did not know how to protect herself from [Appellant] and was afraid the police would send her back to him. She further testified that [Appellant] and Ms. Jones hit her with a spatula, punched her in the face, made her pull down her pants and then they spanked her, made her stand in a corner for hours and made her sleep on the floor. She explained that [Appellant] primarily hit her, but that Ms. Jones agreed with it and would sometimes hit her as well. D.J. said Ms. Jones would use a belt and hit her on top of her clothes on her buttocks. On the other hand, [Appellant] made her pull down her pants and would hit her with a belt, used a spatula to hit her on the hand, and punched her in the face.

The beatings made D.J. hurt all over, especially her legs. She testified that the marks on her legs were caused by [Appellant] beating her. Although Ms. Jones also hit her on her thighs with a belt, she said that no marks were left. D.J. testified that [Appellant] used a belt on her body numerous times and she believed [Appellant] was trying to kill her. [Appellant] did not stop beating her even when she cried.

Before running away from school on May 18, 2018, D.J. had been in trouble a few times for stealing money. She testified that she stole the money so that she could leave the state with Ms. Jones and her brother, and get away from [Appellant].

Both [Appellant] and Ms. Jones testified at the trial on [Appellant's] behalf. Ms. Jones and [Appellant] both admitted that they were in a relationship, but denied that they lived together[.] Ms. Jones testified that [Appellant] would only be in the home a few times a week and stayed over one (1) or two (2) nights. [Appellant] occasionally watched D.J. while Ms. Jones was working, but he did not have her permission to physically discipline D.J. when she was not around.

Ms. Jones testified that on May 18, 2018, she received a phone call from Melrose School that D.J. had been caught stealing again. She explained that D.J. had several issues at school – she stole snacks from other students and money from teachers. However, she never informed police about any of these issues with D.J. at school as an explanation for why she may have run away.

Ms. Jones explained that she had a system for disciplining her children, including D.J., such as taking stuff away, completing a writing assignment, standing against the wall, and finally physical discipline with a belt. She admitted that both she and [Appellant] would "correct" D.J.'s behavior by hitting her with a belt. However, she denied that D.J. was ever disciplined with a spatula or an open or closed hand. [Appellant] also denied that he disciplined D.J. by punching her in the face. He did admit to physically discipling D.J. with a belt on two (2) or three (3) occasions, and that Ms. Jones was present each time.

[Appellant] explained that he and Ms. Jones took "plenty of steps" to avoid using physical discipline on D.J. He further explained that the physical discipline was used only to "correct" D.J.'s repeated bad behaviors of lying and stealing. [Appellant] admitted that using a belt on D.J. was his personal solution to her repeated bad behaviors. He further admitted that he used a belt on the back of D.J.'s legs, but denied that it was on exposed skin.

Both Ms. Jones and [Appellant] denied seeing any welts or scars on D.J.'s legs after they physically disciplined her. Ms. Jones explained that D.J. had scratches and marks from playing, falling out of a tree, falling off her bike, or from eczema. Additionally, both Ms. Jones and [Appellant] asserted that D.J. lied during the trial testimony, as well as in the CRC recorded interview.

Trial Court Opinion, 7/1/21, at 3-12.

In his brief, Appellant raises the following questions for our review.

1. [Whether t]he trial court abused its discretion, erred and infringed [upon Appellant's] constitutional rights in failing to find the evidence presented by the Commonwealth, and viewed in the light most favorable to the Commonwealth, [] insufficient to prove [Appellant's guilt] beyond a reasonable doubt [where] the evidence presented failed to establish that [Appellant] committed [EWOC since the evidence only showed that Appellant took disciplinary action against the victim?]

2. [Whether t]he trial court abused its discretion, erred and infringed [upon Appellant's] constitutional rights in denying [Appellant's] post-sentence [] request for a new trial based upon the weight of the evidence where the jury's verdict is so contrary [to] the weight of the evidence so as to shock one's sense of justice [since t]he evidence failed to establish [Appellant] endangered the welfare of the child where the jury acquitted [Appellant] on the assault charges[?]

3. [Whether t]he trial court abused its discretion, erred and infringed [upon Appellant's] constitutional rights guaranteed under the United States Constitution and Pennsylvania State Constitution in conducting a competency evaluation of the minor complainant in front of the jury[?]

4. [Whether t]he trial court abused its discretion, erred and infringed [upon Appellant's] constitutional rights guaranteed under the United States Constitution and the Pennsylvania State Constitution where the Commonwealth was allowed to introduce testimony from the affiant that [Appellant] had indicated he was going to come to the police station to give a statement and then failed to appear[?]

Appellant's Brief at 4 (renumbered).

In his first issue, Appellant claims the Commonwealth failed to introduce sufficient evidence to establish that he knowingly endangered the victim. This claim fails.

The trial court offered the following analysis of this claim.

- 9 -

The standard for review of a claim of lack of sufficiency is well settled in Pennsylvania:

[W]hether, viewing all evidence admitted at trial, together with all reasonable inferences therefrom, in the light most favorable to the Commonwealth, the trier of fact could have found that each element of the offense charged was supported by evidence and inferences sufficient in law to prove guilt beyond a reasonable doubt.

*Commonwealth v. Yanoff*, 690 A.2d 260, 263 (Pa. Super. 1997). In applying this test, the entire record must be considered, and "the trier of fact, in passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part, or none of the evidence presented." *Id.* Mere conflict in the testimony or the fact that a judge on the same facts would have arrived at a different conclusion does not warrant a new trial. *Commonwealth v. Widmer,* 744 A.2d 745, 752 (Pa. 2000). Furthermore, the Commonwealth may sustain its burden by means of wholly circumstantial evidence. *Commonwealth v. Hopkins,* 67 A.3d 817, 820 (2013).

Appellant asserts that the Commonwealth failed to present sufficient evidence to prove beyond a reasonable doubt that he committed the crime of endangering the welfare of children. Specifically, he asserts that the Commonwealth failed to establish that he endangered the welfare of D.J.'s life as opposed to merely disciplining her.

In Pennsylvania, "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1). The grading of the offense is a felony of the second degree "[i]f the actor's conduct … created a substantial risk of death or serious bodily injury and was part of a course of conduct." 18 Pa. C.S.A. § 4304(a)(b)(iv).

The testimony and evidence adduced at trial, together with all reasonable inferences derived therefrom, is sufficient to sustain the conviction of endangering the welfare of a child. The victim testified that Appellant repeatedly struck her with a belt all over her body, and in some instances, on bare skin. She had so many

bruises on her body that both Ms. Twomey and Ms. Hess stated that there were too many to count. D.J. testified that she ran away from school because she wanted to get away from Appellant and was afraid that he would beat her again.

Ms. Twomey testified she observed numerous bruises and abrasions on D.J.'s face, collarbone, thigh and back of her legs. She also observed several open wounds on the back of D.J.'s legs as well as numerous loop patterns all over her body. Ms. Twomey opined that the injuries were consistent with a history of abusive trauma, and more specifically, being repeatedly struck with a belt. The injuries she observed were consistent with child abuse.

[Ms. Twomey] further testified that while corporal punishment is a legal form of discipline, it is typically done over a clothed buttocks with an open hand without leaving any injuries. In her opinion, D.J.'s injuries were not consistent with corporal punishment. Additionally, both Appellant and Ms. Jones admitted that they used a belt on D.J. as a form of discipline. They further admitted that they typically use the belt on the back of D.J.'s legs. However, they both denied that the "punishment" left marks on D.J.

As the fact-finder, the jury had the benefit of hearing testimony from the victim, Appellant and Ms. Jones, as well as the ability to observe their respective demeanors. Additionally, the jury viewed photographs of the victim's injuries approximately three (3) days after she was found. It is clear that the jury listened carefully and considered the evidence and applicable law in reaching their verdict. Accordingly, the evidence presented at trial, along with all reasonable inferences derived therefrom, is sufficient beyond a reasonable doubt to sustain a conviction of endangering the welfare of a child.

Trial Court Opinion, 7/1/21, at 12-14.

We concur in the trial court's assessment of Appellant's sufficiency challenge and deny relief for each of the reasons set forth by the trial court.

In his second issue, Appellant claims that the jury's verdict was against the weight of the evidence since the evidence introduced at trial established

a corporal punishment defense. Again, we reject this claim for the reasons expressed by the trial court.

In assessing Appellant's weight of the evidence claim, the trial court reasoned as follows.

It is well-settled law that:

> A true weight of the evidence challenge 'concedes that sufficient evidence exists to sustain the verdict' but questions which evidence is to be believed. An appellate court may review the trial court's decision to determine whether there was an abuse of discretion, but it may not substitute its judgment for that of the [trial] court. Indeed, an appellate court should not entertain challenges to the weight of the evidence since [the appellate court's] examination is confined to the "cold record" [and it] may not reverse a verdict unless it is so contrary to the evidence as to shock one's sense of justice.

**Commonwealth v. Galindas**, 786 A.2d 1004, 1011 (Pa. 2001) (internal citations omitted). In reviewing the trial court's denial of a motion for a new trial based upon a challenge to the weight of the evidence, the appellate court will give "the gravest consideration to the findings and reasons advanced by the trial judge." **Commonwealth v. Widmer**, 744 A.2d 745, 753 (Pa. 2000) (internal citations omitted).

In the instant case, the weight of the evidence fully supports the jury's findings. Both the victim and Appellant testified as to their version of events. As the fact-finder, the jury heard all of the testimony and viewed the photographs. Based on the testimony presented, the jury clearly believe that Appellant [did not engage] in corporal punishment, but rather engaged in a court of conduct of violently striking D.J. and creating a substantial risk of bodily injury. Therefore, th[e trial c]ourt did not error in denying Appellant's post-sentence motion for a new trial based on a challenge to the weight of the evidence.

Trial Court Opinion, 7/1/21, at 14-15.

For the reasons expressed by the trial court, we agree that Appellant is not entitled to a new trial because the verdict was against the weight of the evidence.

In his third issue, Appellant claims that the trial court abused its discretion in conducting a competency evaluation of the minor complainant in front of the jury and in declaring the complainant competent to testify, again in the presence of the jury. Although our Supreme Court has adopted a *per se* rule requiring the trial court to conduct competency inquiries outside the hearing of the jury, *see Commonwealth v. Washington*, 722 A.2d 643, 647 (Pa. 1998), we agree with the trial court that, in this case, Appellant waived this issue since it was not raised and preserved at trial.[6] *See* Pa.R.A.P. 302(a). Counsel for Appellant did not object when the Commonwealth explored the minor victim's competency in the presence of the jury. Counsel also did not object when the court expressed its view that the minor victim was competent. Lastly, counsel for Appellant agreed in front of the jury that that the victim was competent to testify. *See* N.T. Trial, 10/22/20, at 166. Because Appellant waived appellate review of this claim, it cannot serve as a basis for relief on appeal.

---

[6] The statement of the case section of Appellant's brief does not specify the location within the record where Appellant preserved this claim. *See* Pa.R.A.P. 2117(c) (requiring statement of manner and location in record where issue was raised and preserved).

In his final issue, Appellant claims the trial court violated his constitutional right to remain silent by allowing the Commonwealth, in response to Appellant's testimony that he had a conversation with an investigating detective, to introduce evidence showing that Appellant never gave a formal statement. This issue also fails.

Appellant's final issue arose from the following developments at trial. During direct examination, defense counsel asked Appellant whether he ever spoke to an investigating detective regarding this matter. *See* N.T. Trial, 10/26/20, at 375. Appellant answered, "Yeah, we had a conversation together." *Id.* A sidebar discussion between counsel for the parties and the trial court ensued.[7] During this discussion, defense counsel offered that Appellant's statement was correct since there was a conversation during which the investigating detective asked Appellant to come to the police station. The Commonwealth, however, argued that Appellant's testimony created an inference of cooperation. The trial court then presented a stipulation to the jury, explaining that Appellant participated in a conversation with an investigating detective in which he agreed to come to the police department. The stipulation further explained, however, that Appellant did not appear for that appointment. The court also advised the jury that no adverse inference could be drawn from Appellant's election to engage in no further discussions

---

[7] A transcript of the sidebar discussion is not included in the record.

- 14 -

with the police. In its closing argument, the Commonwealth stated to the jury that, while Appellant spoke to an investigating detective, that conversation included only Appellant's agreement to come down to the police department.

On appeal, Appellant maintains that rebuttal testimony offered by the Commonwealth, as well as the prosecutor's closing arguments to the jury, violated his right to remain silent. Appellant asserts that his testimony, to the effect that "he had a conversation with an investigating detective," did not create an inference that he gave a formal statement to officers. Appellant also asserts that, despite the cautionary instruction issued by the trial court, the prejudicial effect of the stipulation presented to the jury far outweighed the probative value it offered to the Commonwealth. Lastly, Appellant claims that the Commonwealth, in its closing argument, impermissibly made a negative reference to his choice not to make a formal statement to the police. These contentions merit no relief.

Our Supreme Court summarized the principles relevant to Appellant's claim as follows.

> In its seminal decision in **Griffin v. California**, 380 U.S. 609 (1965), the [United States Supreme] Court held that where [a] defendant does not testify at trial, the Fifth Amendment precludes the government from using [the] defendant's post-arrest silence as substantive evidence of consciousness of guilt. Following **Griffin**, in **Doyle v. Ohio**, 426 U.S. 610 (1976), the Court invoked the Due Process Clause of the Fourteenth Amendment to extend the prohibition against [prosecutorial] use of post-**Miranda**[8] silence, to impeachment. . . . However, the [United States]

---

[8] **Miranda v. Arizona**, 384 U.S. 436 (1966).

Supreme Court also has determined that neither the Fifth Amendment nor due process forecloses prosecution use of a defendant's pre-arrest, pre-***Miranda*** silence for purposes of impeachment where the defendant elects to testify at trial. ***See Jenkins v. Anderson***, 447 U.S. 231, 238 (1980)[.]

More directly pertinent to the present case, the United States Supreme Court also has recognized that a defendant's silence may bear relevance to, and be admissible to establish, other issues arising in a criminal proceeding. For example, in ***United States v. Robinson***, 485 U.S. 25 (1988), the Court ruled there is no Fifth Amendment proscription precluding the raising of silence in fair response to defense argumentation. . . . The [***Robinson***]Court recognized ***Griffin***'s proscription against a prosecutor, on his own initiative, inviting the jury to draw an adverse inference from silence, but distinguished ***Griffin*** as follows:

> It is one thing to hold, as we did in ***Griffin***, that the prosecutor may not treat a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt; it is quite another to urge, as defendant does here, that the same reasoning would prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence. There may be some "cost" to the defendant in having remained silent in each situation, but we decline to expand ***Griffin*** to preclude a fair response by the prosecutor in situations such as the present one.

***Commonwealth v. DiNicola***, 866 A.2d 329, 334-336 (Pa. 2005), *citing*

***Robinson***, 485 U.S. at 33–34. "For purposes of fair response, admissibility

is presently subject primarily to the trial court's assessment of probative value

versus prejudicial effect on appropriate objection, as is the case with all other

evidence adduced at trial." ***DiNicola***, 866 A.2d at 336, *citing* Pa.R.E. 403.

In its Rule 1925(a) opinion, the trial court rejected Appellant's claim,

stating:

> Finally, Appellant asserts that this Court abused its discretion by allowing the Commonwealth to introduce testimony from the

affiant that Appellant indicated he would come to the police station to give a statement and then failed to appear. This issue is also waived as it was not raised and preserved during the trial or in a post-sentence motion. Pa.R.A.P. 302(a). In fact, this Court is unable to find in the record where Appellant believes the affiant made a comment about him coming down to the police station. During his testimony, Appellant mentions that he spoke to Detective Fetzer, but does not indicate when or where. ([**See** N.T. Trial, 10/26/20, at 375]). Although there is a sidebar discussion regarding Appellant's statement that he would come down to the police station and never appeared, there was no testimony adduced from the affiant on that issue. Therefore, this issue is appropriately deemed to be waived.

Trial Court Opinion, 7/1/21, at 17.

Despite our own review of the certified record, we have been unable to locate testimony from the investigating detective which addresses Appellant's failure to appear at the police station. As such, we agree with the trial court that this aspect of Appellant's claim cannot be the subject of appellate review. Moreover, we conclude that, in the circumstances of this case, neither testimony from a Commonwealth witness nor the closing argument offered by the prosecutor violated Appellant's right to remain silent. Appellant affirmatively testified before the jury that he had a "conversation" with an investigating detective in this case but did not divulge the nature or subject matter of that conversation to the fact-finder. Absent elaboration, it was within the trial court's discretion to find that Appellant's reference to a "conversation" with investigating officers raised an inference of cooperation. To provide context to Appellant's ambiguous testimony and clarify the nature of Appellant's "conversation" for the jury, the prosecutor noted in closing that

Appellant's discussion with the investigating officer focused exclusively upon Appellant's agreement to come down to the police station, suggesting (by omission) that the discussion did not involve the submission of a formal statement. The prosecutor's closing comments thus clarified Appellant's affirmative testimony to the jury and did not invite the fact-finder to draw an adverse inference from his silence. While there may have been some minimal cost to Appellant,[9] the prosecutor's closing arguments constituted a fair response to defense argumentation and not a violation of Appellant's right to remain silent.

For each of the foregoing reasons, we conclude that Appellant is not entitled to relief. Accordingly, we shall affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

---

[9] Although Appellant forwards an undeveloped claim asserting that the prejudicial effect of the trial court's stipulation far outweighed any probative value for the Commonwealth, the trial court instructed the jury that Appellant possessed the right to remain silent and that no adverse inference could be drawn from his decision not to speak with the police. We presume that a jury follows instructions given by the court. *See Commonwealth v. O'Hannon*, 732 A.2d 1193, 1196 (Pa. 1999) ("Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions.").

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>03/25/2022</u>