J-S11007-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| NYSARE ONEIL O. ALSTON | : | |
| | : | |
| Appellant | : | No. 215 EDA 2018 |

Appeal from the Judgment of Sentence November 16, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0007416-2016,
CP-51-CR-0007420-2016

BEFORE: SHOGAN, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SHOGAN, J.: **FILED MAY 13, 2019**

Nysare Oneil O. Alston ("Appellant") appeals from the judgment of sentence imposed after a jury found him guilty of murder in the first degree, conspiracy to commit murder, two counts of robbery, two counts of kidnapping for ransom, firearms not to be carried without a license, firearms not to be carried in public, possession of an instrument of crime ("PIC"), attempted murder, and aggravated assault.[1] We affirm.

The trial court summarized the facts of this case as follows:

On April 17, 2014, [Appellant], Brandon McKelvey, Christopher Corley[, DeForest Johnson,] and Ken Thomas kidnapped Carl Johnson and Ryan Hardy, as part of a robbery scheme.[1] During the course of the robbery, both men were shot.

---

[1] 18 Pa.C.S. §§ 2502(a), 903, 3701, 2901, 6106, 6108, 907, 901(a), and 2702, respectively.

[Carl] Johnson died as a result of his injuries. Hardy was injured, but survived.

> [1] Co-defendant DeForest Johnson filed a Motion for Severence [sic], which was granted. Co-defendant, Ken Thomas entered into an open guilty plea to murder of the third degree, kidnapping, conspiracy to commit robbery, VUFA [Violations of the Uniform Firearms Act] charges, aggravated assault, [PIC] and avoiding apprehension. N.T., 11/08/17 at pp. 200–202. Thomas testified in the instant matter pursuant to a Memorandum of Agreement with the Commonwealth. He has not been sentenced yet.

Trial Court Opinion, 6/6/18, at 3.[2] Following Appellant's jury trial and convictions, the trial court sentenced him on November 16, 2017, "to concurrent terms of life without the possibility of parole for the first degree murder and conspiracy to commit murder convictions and a consecutive ten (10) to twenty (20) years confinement for the attempted murder conviction. No further penalty was imposed for the remainder of the charges." *Id.* at 1–2.

Appellant filed a post-sentence motion challenging the weight and sufficiency of the evidence. Post-Sentence Motion, 11/26/17, at ¶¶ 3, 4. The trial court denied Appellant's post-sentence motion without a hearing. Order, 12/11/17. This appeal followed. Notice of Appeal, 1/4/18. Appellant and the trial court complied with Pa.R.A.P. 1925.

---

[2] Appellant was tried together with co-defendants Corley and McKelvey. Co-defendant Corley's appeal is lodged at 209 EDA 2018, and co-defendant McKelvey's appeal, at 65 EDA 2018.

On appeal, Appellant presents the following two questions:

I.   Whether the adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice where there was no physical evidence linking the Appellant to the crimes, where the cooperating co-defendant was a corrupt and polluted source who had lied on previous occasions to the police but who nevertheless established unequivocally that the Appellant did not share the intent to kill, where the cell phone evidence was circumstantial and based upon an incomplete analysis and investigation of other calls and people associated with the cooperating co-defendant, and where the convictions are based upon the preposterous theory that the Appellant arranged for an abduction of the victims in front of his own home?

II.  Whether the adjudication of guilt for First Degree Murder, Attempted First Degree Murder and Conspiracy to Commit Murder is based upon insufficient evidence were the Appellant did not shoot the decedent or the other victim and where the Commonwealth did not prove beyond a reasonable doubt that he shared the intent to kill?

Appellant's Brief at 6.

Because a successful sufficiency-of-the-evidence claim warrants discharge on the pertinent crime, we address Appellant's second issue first. *Commonwealth v. Toritto*, 67 A.3d 29, 33 (Pa. Super. 2013) (citing *Commonwealth v. Stokes*, 38 A.3d 846 (Pa. Super. 2011)). Appellant argues that there was insufficient evidence presented to support a finding of guilt on the charges of first degree murder, attempted first degree murder, and conspiracy to commit murder. Appellant's Brief at 25–26. Specifically, Appellant contends that the Commonwealth failed to prove that he shared his co-conspirator's specific intent to kill Carl Johnson and Ryan Hardy. *Id.*

Our standard of review is well established:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder['s]. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Enix*, 192 A.3d 78, 81 (Pa. Super. 2018) (quoting

*Commonwealth v. Estepp*, 17 A.3d 939, 943–944 (Pa. Super. 2011)).

"A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S. § 2502(a). To prove murder in the first degree, the Commonwealth must demonstrate that a human being was unlawfully killed, that the defendant did the killing, and that the killing was done in an intentional, deliberate, and premeditated manner. *Commonwealth v. Bryant*, 67 A.3d 716, 721 (Pa. 2013). "What distinguishes first degree murder from all other forms of homicide is the existence of a specific . . . intent to kill." *Commonwealth v. Wayne*, 720 A.2d 456, 460 (Pa. 1998) (citation omitted).

- 4 -

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa.C.S.A. § 901(a). "A person may be convicted of attempted murder 'if he takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act.'" ***Commonwealth v. Jackson***, 955 A.2d 441, 444 (Pa. Super. 2008) (quoting ***Commonwealth v. Dale***, 836 A.2d 150, 152 (Pa. Super. 2003)).

> To convict a defendant of conspiracy, the trier of fact must find that: (1) the defendant intended to commit or aid in the commission of the criminal act; (2) the defendant entered into an agreement with another (a "co-conspirator") to engage in the crime; and (3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. The essence of a criminal conspiracy, which is what distinguishes this crime from accomplice liability, is the agreement made between the co-conspirators.
>
> "Mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient" to establish that a defendant was part of a conspiratorial agreement to commit the crime. There needs to be some additional proof that the defendant intended to commit the crime along with his co-conspirator. Direct evidence of the defendant's criminal intent or the conspiratorial agreement, however, is rarely available. Consequently, the defendant's intent as well as the agreement is almost always proven through circumstantial evidence, such as by "the relations, conduct or circumstances of the parties or overt acts on the part of the co-conspirators."

***Commonwealth v. Golphin***, 161 A.3d 109, 1018–1019 (Pa. Super. 2017), *appeal denied*, 170 A.3d 1051 (Pa. 2017) (quoting ***Commonwealth v. Murphy***, 844 A.2d 1228, 1238 (Pa. 2004) (internal citations and quotation marks omitted)).

Where murder is committed in the furtherance of a conspiracy, each member of a conspiracy to commit murder can be convicted of murder of the first degree, regardless of who inflicted the fatal wound. Specific intent to kill can be inferred from the use of a deadly weapon on a vital part of the body. ***Murphy***, 844 A.2d 1238. ***Accord Golphin***, 161 A.3d at 1018–1019 ("Once the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act.").

Viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, we agree with the trial court that there was sufficient evidence to enable the trier of fact to find every element of murder of the first degree, attempted first degree murder, and conspiracy beyond a reasonable doubt. N.T. (Ken Thomas), 11/8/17, at 87–213; N.T. (Ladashe Johnson), 11/9/17, at 53–69; N.T. (Detective James Dunlap), 11/13/17, at 3–56. In support of our conclusion, we adopt as our own the well-reasoned analysis of the trial court in its Pa.R.A.P. 1925(a) opinion. Trial Court Opinion, 6/6/18, at 23–28.

Appellant's remaining issue is a challenge to the weight of the evidence. Appellant's Brief at 20. Appellant complains that the jury "capriciously disregarded" the lack of fingerprint, DNA, and video evidence linking him to the crimes. ***Id.*** at 21. Appellant also complains that the jury "capriciously

disregarded the unrebutted testimony of Kenneth Thomas that . . . Appellant's intention was to release the victims and not kill them." *Id.* According to Appellant, Ken Thomas' unrebutted testimony "soundly exonerated" Appellant "from having the *mens rea* for First Degree Murder, Attempted First Degree Murder and Conspiracy to Commit Murder." *Id.* at 23 (italics supplied).

We have held that "[a] motion for [a] new trial on the grounds that the verdict is contrary to the weight of the evidence[] concedes that there is sufficient evidence to sustain the verdict." *Commonwealth v. Rayner*, 153 A.3d 1049, 1054 (Pa. Super. 2016) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000)). Our Supreme Court has described the standard applied to a weight-of-the-evidence claim as follows:

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider de novo the underlying question of the weight of the evidence." An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

*Commonwealth v. Cash*, 137 A.3d 1262, 1270 (Pa. 2016) (internal citations omitted). A trial court's determination that a verdict was not against the interest of justice is "[o]ne of the least assailable reasons" for denying a new trial. *Commonwealth v. Colon–Plaza*, 136 A.3d 521, 529 (Pa. Super. 2016) (quoting *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013)). A verdict

- 7 -

is against the weight of the evidence where "certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." **Commonwealth v. Lyons**, 833 A.2d 245, 258 (Pa. Super. 2003) (quoting **Widmer**, 744 A.2d at 751–752). "[W]e do not reach the underlying question of whether the verdict was, in fact, against the weight of the evidence.... Instead, this Court determines whether the trial court abused its discretion in reaching whatever decision it made on the motion[.]" **Commonwealth v. Ferguson**, 107 A.3d 206, 213 (Pa. Super. 2015) (citation omitted).[3]

Here, the trial judge, who viewed the witnesses' demeanors at trial, determined that the verdict did not shock her sense of justice. We ascertain no abuse of discretion in this determination. In support of our conclusion, we adopt as our own the well-reasoned analysis of the trial court in its Pa.R.A.P. 1925(a) opinion. Trial Court Opinion, 6/6/18, at 17–23. We add an observation. According to Appellant, Thomas' testimony that Appellant did not intend to kill the victims was unrebutted evidence that Appellant lacked the requisite *mens rea* for murder. We remind Appellant that co-conspirator McKelvey's cellmate, Aaron Smith, contradicted Thomas' testimony: Smith

---

[3] A challenge to the weight of the evidence must first be raised at the trial level "(1) orally, on the record, at any time before sentencing; (2) by written motion at any time before sentencing; or (3) in a post-sentence motion." **Commonwealth v. Akrie**, 159 A.3d 982, 989 (Pa. Super. 2017). Appellant properly preserved his weight of the evidence claim by raising the issue in his post-sentence motion filed on November 26, 2017.

testified that McKelvey confessed to killing Carl Johnson because Appellant believed that Carl Johnson would have identified Appellant. N.T., 11/13/17, at 107–108.

We discern no error of law or abuse of discretion by the trial court. Accordingly, Appellant is not entitled to relief.[4]

Judgment of sentence affirmed.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/13/19

---

[4] The parties are directed to attach a copy of the trial court's June 6, 2018 opinion in the event of further proceedings in this matter.

FILED

2018 JUN -6 AM 10: 56

OFFICE OF JUDICIAL RECORDS
CRIMINAL DIVISION
FIRST JUDICIAL DISTRICT
OF PENNSYLVANIA

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA

CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  :  CP-51-CR-0007416-2016

                                   :  CP-51-CR-0007420-2016

v.                          :

NYSARE O'NEIL O ALSTON  :  215 EDA 2018

                                   :

CP-51-CR-0007416-2016 Comm. v. Alston, Nysare Oneil O
Opinion

8119474431

## OPINION

Rose Marie DeFino-Nastasi, J.

## PROCEDURAL HISTORY

On November 16, 2017, the Defendant was found guilty after a jury trial, presided over by the Honorable Rose Marie Defino-Nastasi, of Murder of the First Degree, 18 Pa. C.S. § 2502(a), as a felony of the first degree; Conspiracy to Commit Murder, 18 Pa. C.S. § 903; two (2) counts of Robbery (Inflict Serious Bodily Injury), 18 Pa. C.S. § 3701, each a felony of the first degree; two (2) counts of Kidnapping for Ransom, 18 Pa. C.S. § 2901, each a felony of the first degree; Violation of the Uniform Firearms Act (Firearms Not to be Carried without a License), 18 Pa.C.S. § 6106, as a felony of the third degree; Violation of the Uniform Firearms Act (Firearms not to be carried in Public), 18 Pa.C.S. § 6108, as a misdemeanor of the first degree; Possession of an Instrument of Crime, 18 Pa.C.S. § 907, as a misdemeanor of the first degree; Attempted Murder, 18 Pa. C.S. § 901(a), as a felony of the first degree; and Aggravated Assault, 18 Pa. C.S. § 2702, as a felony of the first degree. On that same date, the Defendant was sentenced to concurrent terms of life without the possibility of parole for the first degree murder and conspiracy to commit murder convictions and a consecutive ten (10) to twenty (20)

1

years confinement for the attempted murder conviction. No further penalty was imposed for the remainder of the charges.

On November 26, 2017, the Defendant filed a timely post-sentence motion challenging the weight and sufficiency of the evidence.

On December 11, 2017, the Defendant's post-sentence motion was denied without a hearing.

On January 4, 2018, the Defendant filed a timely Notice of Appeal with the Pennsylvania Superior Court.

On January 28, 2018, the Defendant filed a Rule 1925(b) Concise Statement of Matters Complained of on Appeal, pursuant to an Order of the Court, claiming, verbatim, that:

I.  The adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice where there was no physical evidence linking the defendant to the crimes, where the co-operating co-defendant was a corrupt and polluted source who had lied on previous occasions to the police, where the cell phone evidence was circumstantial and based upon an incomplete analysis and investigation of other calls and people associated with the co-operating co-defendant, and where the convictions are based upon the preposterous theory that the defendant arranged for an abduction of the victims in front of his own home.

II.  The adjudication of guilt for First Degree Murder is based upon insufficient evidence where the defendant did not shoot the decedent and where the evidence that he intended to kill is derived solely from a co-operating co-defendant.

2

## FACTS

On April 17, 2014, the Defendant, Brandon McKelvey, Christopher Corley and Ken Thomas kidnapped Carl Johnson and Ryan Hardy, as part of a robbery scheme. [1] During the course of the robbery, both men were shot. Johnson died as a result of his injuries. Hardy was injured, but survived.

Ken Thomas testified that he lives in North Philadelphia and was friends with all of his co-defendants in this case. Thomas knew Brandon McKelvey as 'SK' since they were children. They grew up together in the Strawberry Mansion neighborhood of Philadelphia. Thomas knew Christopher Corley as 'C' since approximately 2008-2009. They lived in the same neighborhood. It was Corley who introduced him to the Defendant. Thomas knew the Defendant as 'NA' since 2014. Thomas knew DeForest Johnson as 'Big Huss'. Thomas testified that the Defendant was the only co-defendant, out of the group, who knew the decedent.

Thomas admitted that he was involved in the kidnapping, robbery, and murder of the decedent and the attempted murder of Ryan Hardy on April 17, 2014, along with his co-defendants. N.T. 11/08/17 at pp. 88-97.

Thomas testified that it was the Defendant's idea to kidnap and rob the decedent for money and drugs and that all five of them agreed that it was a great idea. The group also planned to get the decedent's "connect." [2] Thomas testified that: "The original plan was for us to find an abandoned house, so we can take him to an abandoned house and see how much

---

[1] Co-defendant DeForest Johnson filed a Motion for Severence, which was granted. Co-defendant Ken Thomas entered into an open guilty plea to murder of the third degree, kidnapping, conspiracy to commit robbery, VUFA charges, aggravated assault, possession of an instrument of crime, and avoiding apprehension. N.T. 11/08/17 at pp. 200-202. Thomas testified in the instant matter pursuant to a Memorandum of Agreement with the Commonwealth. He has not been sentenced yet.

[2] "Connect" referred to the person that supplied the decedent, a cocaine dealer, with cocaine. The five of them wanted to get the decedent to call his supplier so that they could rob the supplier of drugs and money as well. *Id.* at pp. 99-100.

3

information we can get out of him. When we get him, he was going to come with drugs We were going to take the drugs he got, get him to call his connect, and see if Nysare was to play a role as far as like questioning him and if he sees Nysare's face, he was supposed to kill him." The group planned to torture the decedent, to get information about his "connect," once they had him in the abandoned house. Ultimately, it was decided that the decedent would have to be killed so he wouldn't retaliate. *Id.* at pp. 98-103.

Thomas testified that he met up with McKelvey, Corley, and DeForest Johnson at a hardware store at 29th and Dauphin Streets in Strawberry Mansion on the morning of the incident. The four men purchased duct tape and saran wrap for the purpose of tying up the decedent. This was the Defendant's idea. The four then went to the Defendant's house. Thomas was driving his Grand Prix followed by the McKelvey, Corley, and DeForest Johnson in Johnson's big, green van. Thomas had a .38 caliber gun on his person and there was a .9 millimeter gun in the van. The .9 millimeter gun belonged to Corley.

The Defendant met the others at the van, and the group discussed their plan, outside of the Defendant's house on Queen Lane. The Defendant planned to invite the decedent over to the Defendant's house under the guise of purchasing drugs from him. The Defendant would ask the decedent to park his vehicle in the rear driveway when he arrived. Thomas would block the decedent's vehicle in the driveway with his Grand Prix. McKelvey and DeForest Johnson would grab the decedent from his car and place him into their van. Corley would drive the van and the Defendant would drive the decedent's car.

To initiate the scheme, the Defendant called the decedent. The decedent was at the gym, so the two agreed that the decedent would call when he was finished. The group waited for approximately one (1) to two (2) hours for the decedent to arrive. Thomas was positioned in his

4

Grand Prix to block the decedent's vehicle once he pulled into the driveway. McKelvey, Corley, and DeForest Johnson were inside the van, which was already parked in the Defendant's driveway. The group communicated via conference calls on their cell phones while they waited. *Id.* at pp. 104-121.

The decedent called the Defendant and told him that he was leaving the gym and was on his way to the Defendant's house. At the same time, the Defendant's step-father arrived and told the Defendant that his friends had to remove the van from the driveway. The van exited the driveway and began circling the block. The decedent arrived, and instead of pulling into the driveway, parked his Camaro on Knox Street, which was on the side of the Defendant's house. Thomas saw the decedent standing on the corner talking on the phone. The Defendant told the other four males that he was talking to the decedent and that they would have to abduct him where he was standing on the corner. Thomas waited for the van to circle around, and followed behind it. *Id.* at pp. 124-125.

The van pulled next to the decedent's vehicle and Thomas' Grand Prix pulled behind it. McKelvey, Thomas, DeForest Johnson, and Corley exited their respective vehicles. Thomas and DeForest Johnson, at point of gun, grabbed the decedent and shoved him into the van. Unbeknownst to the group, another male, Ryan Hardy, had accompanied the decedent, and was seated in the decedent's vehicle. Thomas and McKelvey, at point of gun, grabbed Hardy out of the decedent's vehicle and shoved him in the van as well. Thomas returned to his Grand Prix and the Defendant entered the decedent's vehicle. The three vehicles (Thomas' Grand Prix, the van, and the decedent's Camaro) initially drove off in the same direction, however, the van turned onto Hansberry Street and the Defendant continued driving straight with Thomas following behind him. McKelvey, Corley, DeForest Johnson, Hardy, and the decedent were

5

inside the van. A surveillance video was played for the jury from the Complete Grocery and Deli at the corner of Knox and Hansberry Streets. The van was visible turning left onto Hansberry Street while the decedent's vehicle and Thomas' vehicle continued straight on Knox Street. Thomas did not know where the van went after it turned onto Hansberry Street. *Id.* at pp. 125-139.

Thomas followed the Defendant back to the Defendant's house. The Defendant found drugs and jewelry in the decedent's vehicle. Thomas joined the Defendant in the decedent's vehicle and they drove to the Defendant's grandmother's house and remained there for approximately one (1) to two (2) hours. During this time, they were in phone contact with the co-defendants in the van. *Id.* at pp. 144-145.

Corley informed Thomas that the decedent told him that the decedent had some drugs at his house, hidden in the basement above the washer. Thomas and the Defendant drove to the decedent's house[3] at Frankford and Magee Avenues. No one was home, so they entered the house using the house key on the decedent's car key ring. The Defendant retrieved one-half of a kilo of cocaine, worth approximately twenty-thousand dollars ($20,000.00), which was hidden in the basement. Thomas took a large television. Additionally, the decedent had approximately nine (9) ounces of cocaine on him in the van. Thomas and the Defendant then drove to meet up with the van on Clarissa Street. *Id.* at pp. 146-152.

The Defendant said that he knew a "duckey spot", along the 5600 block of Newtown Avenue, where the group could dump the decedent and Hardy. Once the Defendant, Thomas, McKelvey, Corley, Johnson, the decedent, and Hardy arrived at the 5600 block of Newtown Avenue, Thomas took the jewelry that had been found in the decedent's car to Kensington to

---

[3] The decedent gave Corley, Johnson, and McKelvey his address, which Corley relayed to the Defendant and Thomas.

6

sell.[4] The Defendant, McKelvey, Corley, DeForest Johnson, Hardy, and the decedent remained on Newtown Avenue. *Id.* at pp. 151-158.

Later the same day, Thomas met up with the Defendant, McKelvey, Corley, and DeForest Johnson at Johnson's house in West Philadelphia. The cocaine was divided up equally among the group.[5] Thomas and the Defendant cleaned the decedent's vehicle, inside and outside, with bleach, to remove any fingerprints. The vehicle was left in West Philadelphia on Pennsgrove Street. McKelvey told Thomas that he had shot the decedent and Hardy with the .9 millimeter gun. *Id* at pp. 158-168.

Ryan Hardy testified that he and the decedent both had a child by the same woman. On April 17, 2014, Hardy met up with the decedent at Planet Fitness in the Frankford neighborhood of Philadelphia. After working out at the gym, Hardy accompanied the decedent to meet up with the decedent's friend. Hardy was driving because the decedent's arms were tired from his workout. Hardy parked near the intersection of Queen Lane and Hansberry Street in the Germantown section of the city. Approximately ten (10) to fifteen (15) minutes after he parked, a group of males with guns surrounded the vehicle. A van pulled up next to the driver's side door. The males, at point of gun, dragged the decedent and Hardy out of the vehicle and shoved them in the van. The males placed duct-tape on their mouths and eyes. The males also duct-taped Hardy's hands and feet together and put him in the back of the van. Hardy was hit in the head with a gun and was told by one of the males to put his head down. He heard the male say, "this ain't for you, it's for him...this ain't for you, light skin." "You were at the wrong place at

---

[4] Thomas could not recall when the jewelry was handed to him, but the Defendant had given it to Thomas to sell.
[5] The Defendant, Johnson, Corley, Thomas, and McKelvey all received approximately "a couple thousand" dollars-worth of cocaine.

7

the time." Hardy heard the males repeatedly asking the decedent for money. N.T. 11/4/17 at pp. 4-13, 26-41.

Hardy further testified that the males were torturing him; cutting him on his wrists, neck, and ears. Hardy could not see what they were cutting him with because his eyes were covered with duct tape. Hardy heard three or four different voices but was not familiar with any of them. The males took Hardy's money, wallet, and cell phone. He felt like he was in the van for "a couple of hours" and the males were beating the decedent the whole time.[6]

The van eventually came to a stop and the males threw Hardy from the van. Hardy was shot "four or five times" after being thrown out of the van. Hardy pulled the tape off of his eyes and saw the decedent on the ground, bleeding from his mouth, with duct tape over his eyes. Hardy started to ask for help from every car that passed by until the police arrived. *Id.* at pp. 14-17, 43-45, 50-53.

Police transported Hardy to Albert Einstein Medical Center where he remained for more than five days. Hardy was shot in the right forearm, left ribs, and back. He had razor cuts to his nose, left neck, left wrist, and left ear. Hardy was transferred to Moss Rehab facility for approximately two months because he was initially paralyzed from the waist down due to spinal injuries caused by a bullet. Hardy had to re-learn how to walk and will never walk without issue because the bullet could not be removed from his spine. *Id.* at pp. 18-22, 46-48.

Michael Gutierrez testified that at approximately 5:42 p.m., on April 17, 2014, he heard gunshots while driving down Adams Avenue from Front Street and crossing over Crescentville Road. Approximately one (1) minute later, while driving under a train-bridge on Newtown

---

[6] In his statement to homicide detectives, Hardy stated that he could hear the sound of a gun beating on the decedent's head. Hardy also stated that the males cut the duct tape off of him and re-taped him because they did not want fingerprints on the tape. N.T. 11/14/17 at p. 54-56.

8

Avenue, Gutierrez saw a male laying on the ground and another male next to him, standing, pulling duct tape off his face and wrists. Gutierrez had to swerve to avoid hitting the two males. The male laying on the ground was curled in a fetal position, in a puddle of blood, with duct tape covering his face. The other male hobbled towards Gutierrez's van, saying repeatedly that he had been "hit", and needed to go to the hospital. Gutierrez, fearing more gunshots, drove past the train tracks, pulled over to the right on Godfrey Avenue[7], and called 911. N.T. 11/08/17 at pp. 8-11, 14-23.

Denni Glenn testified that she was in a relationship with DeForest Johnson for approximately seven (7) years. Their relationship ended in September of 2014. Glenn testified that she was the owner of a green, 1997, Ford E-150 van with plate number JSY-9931. In April of 2014, her relationship with Johnson was on-and-off, but Johnson was permitted use of her van when he needed it. Glenn gave the van to Johnson after their relationship ended. N.T. 11/09/17 at pp. 5-13.

Ladashe Johnson testified that she is from the Germantown neighborhood of Philadelphia. Ms. Johnson was friends with Nadirah Alston; the Defendant's sister. She had known the decedent since 2007. In 2013, they began a romantic relationship. Ms. Johnson was still in a relationship with the decedent when he was murdered. At the time of his murder, the decedent had been living in the Kensington neighborhood of Philadelphia and driving a Camaro. Ms. Johnson also knew Ryan Hardy to be a friend of the decedent. *Id.* at pp. 54-58.

In 2014, prior to the decedent's murder, Nadirah Alston asked Ms. Johnson for the decedent's phone number for her brother, the Defendant. At the time, the decedent did not have his own phone and would take calls on Ms. Johnson's phone. Ms. Johnson told the decedent

---

[7] Newtown Avenue is a short, one-way street between Adams and Godfrey Avenues that merges into Godfrey Avenue.

9

about the request and she gave Nadirah permission to give the Defendant her phone number. Thereafter, the Defendant would call Ms. Johnson's phone to get in contact with the decedent.[8] Ms. Johnson provided homicide detectives with the number that she had given Nadirah Alston to give to the Defendant. She also provided the number to the phone[9] the decedent was using on the day he was murdered, and the number for the Defendant that appeared on her phone when he called. Ms. Johnson last spoke to the decedent on the day of his murder between 12:00 p.m. and 1:00 p.m. At that time, the decedent told her that he was leaving the gym and was on his way home to take a shower. *Id.* at pp. 58-69.

Debra Holmes testified that she was living on the 3800 block of Pennsgrove Street in 2014. On April 17, 2014 at approximately 7:00 p.m., Holmes looked out of her front window and saw two African-American males washing a Chevrolet Camaro. The two males left the Camaro covered in a white substance. Holmes was the block captain, so her neighbors called her to complain about the car, because it had a white film over the outside, and the keys were sitting inside of it with a window open. Realizing the car was covered in bleach,[10] Holmes called the police to report the suspicious vehicle on April 18, 2014. *Id.* at pp. 179-186.

Aaron Smith testified that he met Brandon McKelvey in jail, in 2015, when Smith was incarcerated for a robbery conviction. Smith and McKelvey bonded when they discovered that they had mutual friends in North Philadelphia. McKelvey told Smith that he was worried because one of his friends was charged with a crime that McKelvey had committed with him. McKelvey told Smith that he didn't understand how his friend "Ken" got caught, because it was done so perfectly. He also admitted that he was the shooter, and was fearful that if Ken

---

[8] The decedent was using his brother's phone on the day of the murder.
[9] This was the number to the decedent's brother's phone. The decedent had moved on to using his brother's phone after using Ms. Johnson's phone for a period.
[10] Ms. Holmes testified that the Camaro smelled of bleach.

10

implicated him, he could face the death penalty. McKelvey told Smith that this crime was a robbery, kidnapping, and homicide. McKelvey said that one of his friends knew the decedent because he used to buy drugs from him, and that this friend was the person that set up the robbery. McKelvey said that he and his friends ordered drugs and waited for the decedent to make the delivery. When the decedent arrived, they boxed his vehicle in. They used two cars, a green van and another car. McKelvey and his friends kidnapped the decedent and another guy and put them in the green van. N.T. 11/13/17 at pp. 103-107.

Smith further testified that McKelvey told him: "one of the guys cut one of the guy's faces and then they told where the drugs was at, where the rest of the drugs was at and he (McKelvey) said they drove to the northeast section of Philadelphia. Once the guys confessed where the drugs was at, he (McKelvey) pushed the guys out of the van, and opened fire on them because one of the guys said that they had to be put down because he (decedent), basically, knew the guy, the one who set it up." McKelvey also told Smith that he had used a .9 millimeter gun to shoot the decedent and Ryan Hardy. *Id.* at pp. 107-108, 136-142.

Philadelphia Police Officer, John Madonna, testified that at approximately 5:42 p.m., on April 17, 2014, he received a radio call regarding gunshots fired on the 5600 block of Newtown Avenue by Godfrey Avenue. Officer Madonna arrived on the scene approximately two to three minutes after receiving the radio call. Upon arrival, Officer Madonna got out of his police cruiser to help Officers Scarinci and Ringstaff put Ryan Hardy into their patrol wagon. The other male was unresponsive and had no pulse. His eyes and wrists were duct-taped, his face was bloody, and he appeared to have gunshot wounds to his chest and leg. The male was pronounced by medics, on scene, at approximately 6:00 p.m. There was a piece of duct tape on the ground next to where the patrol wagon had initially stopped, and there were several fired cartridge casings

11

(hereafter 'FCCs') on the ground around where the decedent had been laying. N.T. 11/08/17 at pp. 39-56, 61.

Officer Madonna proceeded to the corner of Newtown and Godfrey Avenues, because he was familiar with the area, and knew there were surveillance cameras. Officer Madonna called the number for Burke Plumbing, located at that intersection, and was able to get the owner to supply Officer Butler of Northeast Detectives with the video footage. *Id.* at pp. 56-63.

Philadelphia Police Officer, Daniel Butler, testified that he is a video retrieval officer for Northeast Detectives. Officer Butler retrieved the surveillance video from Burke Plumbing at 5598 Newtown Avenue.[11] *Id.* at pp. 67-79.

Sergeant William testified that on April 14, 2015, at approximately 3:00 p.m., he and his partner stopped DeForest Johnson for driving with a broken brake light on the 2300 block of North 29th Street. Johnson was driving a green, 1997, Ford van with the license plate number JSY-9931. Sergeant Robbins' report of the incident listed the owner of the vehicle as Denni Glenn and the driver of the vehicle as DeForest Johnson. At the time, Johnson provided his address as 3804 Wyalusing Avenue. N.T. 11/09/17 at pp. 18-26.

Philadelphia Police Officer, Brendan Donahue, testified that he was familiar with Ken Thomas from having seen him around the Strawberry Mansion neighborhood of Philadelphia. At approximately 1:22 p.m., on April 15, 2014, Officer Donahue came into contact with Ken Thomas and the Defendant at 32nd and York Streets[12] in that same neighborhood. Officer Donahue had not seen the Defendant before. Thomas and the Defendant were in a red, 2004 Pontiac Grand Prix with license plate number JMG-0253. The Grand Prix was registered to

---

[11] The video was played for the jury. It showed the green van, Grand Prix, and red Camaro passing the intersection of Newtown and Godfrey just after the murder.

[12] This location was approximately one block from 3127 West Dauphin Street, the home address given to Officer Donahue by Ken Thomas.

12

Thomas. The Defendant was in the driver's seat and Thomas was sitting in the passenger seat. *Id.* at pp. 34-39.

Philadelphia Police Officer, Jeffrey McMahon, testified that he was assigned to the west-end section of the Strawberry Mansion neighborhood of Philadelphia. Officer McMahon testified that he would see Ken Thomas and Christopher Corley in Strawberry Mansion approximately two (2) to three (3) times a week over the course of approximately two years.

Philadelphia Police Officer, Ryan Dooling, testified that on April 18, 2014, at approximately 1:15 p.m., he received a radio call to investigate an automobile[13] on the 3800 block of Pennsgrove Street. When Officer Dooling ran the license-plate number, the car came back as stolen with a note instructing him to hold the car for fingerprinting. The information also indicated that the car was being sought by homicide detectives. Officer Dooling contacted the homicide division and held the car until they arrived. The gray, 2010, Chevrolet Camaro was covered in white residue. The keys were in the driver's seat and the windows were slightly open. The car was owned by the decedent. *Id.* at pp. 77-90.

Philadelphia Police Officer, Craig Perry, testified that he processed the crime scene at 5600 Newtown Avenue on April 17, 2014. Officer Perry recovered five (5) FCCs, a bullet, several bullet fragments,[14] and several pieces of duct tape from the crime scene. Four of the FCCs were discovered in the grass on the side of Newtown Avenue. The decedent's hands were bound together with duct tape and there was duct tape over his eyes. There was a high-impact divot in the ground underneath the body of the decedent, indicating that the decedent had been shot while he was laying on the ground. *Id.* at pp. 94-120.

---

[13] When a Philadelphia Police Officer gets a radio call for "investigate auto" it means that a civilian has noticed a suspicious vehicle and has called 911 to report it.
[14] The bullet fragments were discovered underneath the body of the decedent when he was removed from the street.

13

Philadelphia Police Officer, Robert Stott, testified as an expert in the field of firearms and ballistics evidence. Officer Stott identified the five (5) FCCs recovered from the scene as coming from a .9 millimeter, Luger firearm. Officer Stott determined that all five (5) FCCs were fired from the same .9 millimeter firearm. Officer Stott also examined a .9 millimeter bullet that was recovered from the ground underneath the buttocks of the decedent and a .9 millimeter bullet that was removed from the decedent's chest by the medical examiner. Officer Stott determined that both bullets were fired from the same .9 millimeter firearm. *Id.* at pp. 157-175.

Philadelphia Police Officer, Patrick Raytik, testified as an expert in the field of fingerprint comparison and analysis. Officer Raytik examined two palm print impressions and a fingerprint impression lifted from the decedent's Camaro that was found on the 3800 block of Pennsgrove Street.[15] Only one of the prints, a palm print from the exterior of the passenger-side rear window, was suitable for identification purposes. Officer Raytik determined that this palm print matched the palm of Ken Thomas. *Id.* at pp. 194-201.

Philadelphia Homicide Detective, James Dunlap, testified as an expert in historical cell site analysis.[16] Detective Dunlap analyzed the data associated with five cellular phone numbers: (484) 620-7803 (billed in Brandon McKelvey's name to 2413 North 32nd Street); (215) 909-1127 (billed to Zegregory Corley[17] at 3548 North 13th Street); (267) 888-1883 (the Defendant's phone); (267) 288-8818 (Ken Thomas' phone); and (267) 300-8891 (the decedent's phone). Detective Dunlap determined the locations of these phones on April 17, 2014 in relation to 144 West Queen Lane at approximately 2:00 p.m. (the time and location of the abduction); and 5600

---

[15] Trial counsel stipulated to the fact that Officer Fidler lifted three latent print impressions from the Camaro found on the 3800 block of Pennsgrove Street: one from the exterior of the passenger-side, rear window; one from the top of the driver-side roof; and one from the driver-side, rear-view mirror.

[16] Historical Cell Site Analysis is the process through which the call data records for a phone are used to identify the potential location of the phone.

[17] Zegregory Corley is the brother of Christopher Corley.

14

Newtown Avenue at approximately 5:40 p.m. (the time and location of the homicide). N.T. 11/13/17 at pp. 14-22.

The phones attributable to McKelvey, Thomas, and Corley were all utilizing towers in the Strawberry Mansion neighborhood of Philadelphia between 9:04 a.m. and 10:41 a.m., on the day of the decedent's murder.[18] The decedent's phone and the Defendant's phone had a total of fifteen (15) connections with each other between 10:35 a.m. and 2:04 p.m. The phone attributable to Corley made eleven (11) calls utilizing towers within the area of the decedent's abduction between 12:11 p.m. and 1:58 p.m. The phone attributable to the Defendant made twenty-four (24) calls utilizing cell phone towers in the area[19] of the decedent's abduction between 9:43 a.m. and 2:13 p.m. Thomas' phone made six (6) calls utilizing cell phone towers in the area of the decedent's abduction between 12:25 p.m. and 2:17 p.m. Thomas' phone and the phone attributable to Corley called each other at 12:45 p.m., in the area of the decedent's abduction. That phone call lasted approximately sixty-nine (69) minutes. The same two phones also had a sixteen-and-a-half (16.5) minute call to each other at 1:58 p.m., and an approximately fifty-one (51) minute call to each other at 2:33 p.m., both in the area of the abduction. *Id.* at pp. 22-52.

The phone attributable to McKelvey was utilizing cell-phone towers in the area of 5600 Newtown Avenue at 5:13 p.m., 5:16 p.m., 5:45 p.m., and 5:49 p.m. The phone attributable to Corley made five (5) calls utilizing cell phone towers in the area of 5600 Newtown Avenue between 4:35 pm. and 5:45 p.m. The phone attributable to the Defendant made six (6) calls

---

[18] While the Court acknowledges that McKelvey, Thomas, and Corley all lived in the Strawberry Mansion area, the three phones were geographically located in the same area at the same time, thus corroborating Thomas' testimony that the three men went to a hardware store in the area together, on the morning of the murder, to purchase duct-tape and saran wrap with which to bind the decedent.

[19] It is noted that the Defendant lives in the area, however, the twenty-four (24) calls were made by a phone utilizing the same cell-phone tower that was utilized by the Corley phone when it made eleven (11) calls between 12:11 p.m. and 1:58 p.m.

15

utilizing cell phone towers in the area of 5600 Newtown Avenue between 4:37 p.m. and 5:44 p.m. At 5:44 p.m., that same phone was using the cellular phone tower that McKelvey's phone used at 5:45 p.m. Thomas' phone utilized cell phone towers in the area of 5600 Newtown Avenue at approximately 4:32 p.m., but was located in the Kensington neighborhood of Philadelphia at approximately 5:40 p.m.[20] *Id.* at pp. 27-37.

Thomas' phone and the Defendant's phone were utilizing cell phone towers in the area of the 3900 block of Pennsgrove Street between 6:43 p.m. and 7:26 p.m.[21] In addition, the phones attributable to McKelvey, Thomas, Corley, and the Defendant all used the same cell phone tower at 39th Street and Lancaster Avenue, in the area of the 3900 block of Pennsgrove Street, between 6:38 p.m. and 8:04 p.m. *Id.* at pp. 41-52.

Dr. Albert Chu testified as an expert in the field of forensic pathology. Dr. Chu analyzed the autopsy report for the decedent that had been prepared by Dr. Marlon Osbourne and came to his own conclusion regarding the cause and manner of the death of the decedent. The decedent had four gunshot wounds: one bullet entered the left side of the decedent's upper back, fracturing one of his vertebrae[22]; one bullet entered the left side of the decedent's back, hitting his spine, his aorta, and trachea before exiting the upper right side of his chest; one bullet entered the right side of the decedent's lower back, hitting the decedent's liver and stomach before exiting the front of his upper abdomen; and one bullet entered and exited the decedent's left thigh, damaging soft tissue. The decedent had two lacerations to the scalp on the right side of the back of his head, a number of straight cuts on his forehead, a straight cut on his left forearm, a scrape on his right elbow, and a laceration on the back of his right thigh. The injuries to the decedent's head were

---

[20] Ken Thomas testified that after he dropped the Defendant off at the 5600 block of Newtown Avenue, he drove to the Kensington neighborhood of Philadelphia because he "had a house down there." N.T. 11/08/17 at pp. 155-156.
[21] This is the area where the decedent's vehicle was recovered and where co-defendant DeForest Johnson lived.
[22] This bullet was the only one removed from the decedent's body by the medical examiner.

16

consistent with being hit with a heavy object. No drugs or alcohol were found in the decedent's system. Dr. Chu testified that the cause of the decedent's death was multiple gunshot wounds and the manner of his death was homicide. N.T. 11/13/17 at pp. 152-164.

Dr. Chu also examined the medical records of Ryan Hardy from Albert Einstein Medical Center. Dr. Chu testified that Hardy had two gunshot wounds: one to his right forearm that entered and exited and one on the left side of his torso. Hardy also had lacerations on his "left upper extremity" and scrapes on his right ankle. *Id.* at pp. 164-165.

Trial counsel stipulated to the fact that DeForest Johnson was arrested on this matter on March 8, 2016 at approximately 7:11 p.m. in Newark, New Jersey. At the time of his arrest, Johnson was exiting a green, Ford E-150 van (plate number JSY-9931), registered to Denni Glenn. The van was towed and photographed. Trial counsel also stipulated to the fact that Aaron Smith and Brandon McKelvey were in the same prison unit twice in 2016. McKelvey and Smith shared a cell from April 11, 2016 to April 22, 2016 and from October 27, 2016 to November 15, 2016. Lastly, trial counsel stipulated to the fact that the Defendant, Brandon McKelvey, and Christopher Corley did not have a valid license to carry a firearm. N.T. 11/09/17 at pp. 3-4, N.T. 11/14/17 at pp. 99-101.

## ANALYSES

### ISSUE I

**The adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice where there was no physical evidence linking the defendant to the crimes, where the co-operating co-defendant was a corrupt and polluted source who had lied on previous occasions to the police, where the cell phone evidence was circumstantial and based upon an incomplete analysis and investigation of other**

17

**calls and people associated with the co-operating co-defendant, and where the convictions are based upon the preposterous theory that the defendant arranged for an abduction of the victims in front of his own home.**

The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of witnesses. *Com. v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011), app. denied, 42 A.3d 1059 (Pa. 2012) (citations omitted). "[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Com. v. Thompson*, 106 A.3d 742, 758 (Pa. Super. 2014). Accordingly, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Com. v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013). A trial judge should not grant a new trial due to "a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Clay*, 64 A.3d at 1055. Instead, the trial court must examine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Id.* at 1055. Only where the jury verdict "is so contrary to the evidence as to shock one's sense of justice" should a trial court afford a defendant a new trial. *Id.*

The jury determined the credibility of the evidence in this case after hearing overwhelming direct and circumstantial evidence that the Defendant was a principal actor in a conspiracy to kidnap, rob, and murder the decedent and Ryan Hardy.

The Defendant claims that there was no physical evidence linking the Defendant to the crimes. Physical evidence is not required for a jury to find guilt beyond a reasonable doubt. See

18

*Com. v. Kitchen*, 181 A.3d 337, 346 (Pa. Super. 2018), citing *Com. v. Wise*, 171 A.3d 784, 790 (Pa. Super. 2017) ("It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.") In addition, the "[g]eneral rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy. 18 Pa.C.S.A. § 903." *Com. v. Wayne*, 720 A.2d 456, 463-64 (Pa. 1998). Therefore, the physical evidence found, namely, the palm print of co-conspirator Ken Thomas on the decedent's vehicle, is also evidence against the Defendant.

The jury determined credibility in this case. The jury heard testimony from Ken Thomas that the Defendant devised the scheme to commit this crime, as he alone was the only member of the group that knew the decedent. The Defendant recruited the co-conspirators and gave orders on their various roles. The fact that the Defendant was the mastermind of this criminal enterprise is borne out by direct and circumstantial evidence.

The direct evidence was provided by Thomas, wherein he details the movements of the conspirators on the day of the decedent's kidnapping, robbery, and murder. The cell-site analysis and video evidence, as well as the testimony provided by Ryan Hardy, Ladashe Johnson, Aaron Smith, Debrah Holmes, Officer Robert Stott, and Detective Dunlap corroborate Thomas' account of the movements of each of the conspirators on the date of the incident.

Ryan Hardy described parking the decedent's vehicle on the corner of Queen Lane and Knox Street, whereupon a group of males surrounded the vehicle, pulled him and the decedent from the vehicle, and shoved them in a van. This corroborated Ken Thomas' testimony

19

regarding the circumstances surrounding the abduction of the decedent and Hardy. Moreover, the cell-site analysis confirms that, not only was the Defendant's phone in the area of the abduction, but that it was in contact with the decedent's phone 15 (fifteen) times between 10:35 a.m. and 2:04 p.m. Additionally, Corley's phone and Thomas' phone were utililzing cell towers in the same area during the same time frame. Moreover, the video evidence shows the vehicles of Deforest Johnson, Thomas, and the decedent all pass through an intersection located on the corner of the abduction just after the abduction.

Thomas testified that the decedent and Hardy were taken to a "duckey" spot to be killed and dumped. Thomas met the others at this spot, located at 5600 Newtown Avenue, at approximately 4:30 p.m., but then left to go fence the stolen jewelry in Kensington. Cell-site analysis showed that the phones attributable to Thomas, the Defendant, Corley, and McKelvey were all utilizing cell phone towers in the area of 5600 Newtown Avenue at approximately 4:30 p.m. Thomas' phone then traveled to Kensington, while the other conspirators' phones remained at 5600 Newtown Ave., until the time of the murder at 5:45 p.m. Moreover, the video evidence showed the vehicles of the decedent and Deforest Johnson pass through the intersection of Newtown and Godfrey Avenues just after the murder. Furthermore, the decedent and Hardy were found at 5600 Newtown Avenue moments after the murder.

Thomas testified that he and the Defendant dumped the decedent's vehicle at the 3900 block of Pennsgrove Street following the murder, and that they wiped it down with bleach. The cell-site analysis showed that both the defendant's phone and Thomas' phone were utilizing cell towers in the area of the 3900 block of Pennsgrove between 6:43 p.m. and 7:26 p.m. on the date of the incident.

Thomas testified that all of the conspirators met at DeForest Johnson's house on 39th and Lancaster after the murder to divide the proceeds from the robbery. Cell-site analysis determined that the cell phones attributable to Thomas, the Defendant, Corley, and McKelvey were all utilizing the same cell phone tower located at 39th and Lancaster between 6:38 p.m. and 8:04 p.m.[23]

As to the Defendant's claim that the cooperating co-defendant was a corrupt and polluted source, the jury was instructed on accomplice testimony, bias, and crimen falsi with respect to evaluating the credibility of Ken Thomas. The jury is presumed to follow the court's instructions on the law. See *Com. v. Chmiel*, 30 A.2d 1111, 1184 (Pa. 2011) ("The law presumes that the jury will follow the instructions of the court." citing *Com. v. Spotz*, 896 A.2d at 1224 (citation omitted); see also *Com. v. O'Hannon*, 557 Pa. 256, 732 A.2d 1193, 1196 (1999) ("Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions.").

The jury heard testimony from Ladashe Johnson, the decedent's girlfriend, that she spoke to the decedent at approximately 12:00 p.m. on the day of his murder. The decedent told Johnson that he was on his way home from the gym. This corroborated Ken Thomas' testimony that when the Defendant called the decedent to get him to bring drugs to the Defendant's house, the decedent told the Defendant that he had just left the gym and was on his way to meet him.

The jury heard testimony from Debra Holmes that she observed two African American males washing a Chevrolet Camaro on the 2800 block of Pennsgrove Street at approximately 7:00 p.m., in the evening, after the decedent's murder. Holmes testified that the car smelled of bleach and was covered in a white substance. This corroborated Ken Thomas' testimony that he

---

[23] 39th and Lancaster is approximately one block from 39th and Pennsgrove Street.

21

and the Defendant disposed of the decedent's vehicle on the 3800 block of Pennsgrove Street after wiping it down with bleach.

The jury heard testimony from Officer Robert Stott that the FCCs recovered from the crime scene and the decedent's body were fired from the same .9 millimeter Luger firearm. This corroborated Ken Thomas' testimony that the decedent had been shot with a .9 millimeter gun that belonged to co-conspirator Christopher Corley.

Defendant claims that the "the cell phone evidence was...based upon an incomplete analysis and investigation of other calls and people associated with the co-operating co-defendant." The jury heard evidence that the phone attributable to the Defendant was using cell phone towers in the area of the decedent's abduction, the area of the decedent's murder, and the area where the co-conspirators reconvened after the murder of the decedent. The phone attributable to the Defendant was utilizing cell phone towers at times and locations that directly corresponded with the timeline and locations set out by Ken Thomas as he was depicting the events of the day including: the purchase of supplies, the kidnapping, the murder, and the reconvening of the co-conspirators after the murder. Finally, the defendant's phone and the decedent's phone were in contact fifteen (15) times on the morning of the murder.

Defendant claims that "the convictions are based upon the preposterous theory that the defendant arranged for an abduction of the victims in front of his own home." Actually, this was not the Defendant's original plan. The original plan was to kidnap the decedent in the rear driveway of the Defendant's house, which was a secluded area. That plan was thwarted by the Defendant's step father, when he told the Defendant that his friends had to remove their vehicle from the rear driveway. As a result, at the last minute, the Defendant told his co-conspirators that they would have to kidnap the decedent from the corner where the decedent was standing by his

22

car. Furthermore, this "preposterous theory" was based on the testimony of two eyewitnesses, videotape evidence, and cell site analysis.

The evidence showed that the Defendant and his cohorts concocted a plan to lure the decedent to the Defendant's house where the group, who lie in wait, then abducted the decedent and Hardy at gunpoint, tortured them, robbed them, shot them, disposed of the decedent's vehicle, and divided the proceeds.

Based on the foregoing, as well as the evidence discussed in the sufficiency analysis below, the jury's verdict does not shock one's sense of justice. Therefore the verdict was not against the weight of the evidence.

## ISSUE II

**The adjudication of guilt for First Degree Murder is based upon insufficient evidence where the defendant did not shoot the decedent and where the evidence that he intended to kill is derived solely from a co-operating co-defendant.**

"The standard we apply when reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. **The Commonwealth may**

23

**sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.** Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. Furthermore, when reviewing a sufficiency claim, [the] Court is required to give the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

However, the inferences must flow from facts and circumstances proven in the record, and must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury of an accused's guilt beyond a reasonable doubt. The trier of fact cannot base a conviction on conjecture and speculation and a verdict which is premised on suspicion will fail even under the limited scrutiny of appellate review."

*Com. v. Slocum*, 86 A.3d 272, 275-76 (Pa. Super. 2014) (citing *Com. v. Bostick*, 958 A.2d 543, 560 (Pa. Super. 2008), app. denied, 987 A.2d 158 (Pa. 2009) (quoting *Com. v. Smith*, 956 A.2d 1029, 1035-36 (Pa. Super. 2008) *(en banc)* (emphasis added)).

"To sustain a conviction for first-degree murder, the Commonwealth must prove that: (1) a human being was unlawfully killed; (2) the accused was responsible for the killing; and (3) the accused acted with malice and a specific intent to kill." *Com. v. Williams*, 176 A.3d 298, 306-07 (Pa. Super. 2017). First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d). "A jury may infer malice...based on the defendant's use of a deadly weapon on a vital part of the victim's body." *Id.* at 308 (citing *Com.*

24

*v. Hitcho*, 633 Pa. 51, 123 A.3d 731, 746 (2015)). "Specific intent to kill may be inferred by the use of a deadly weapon upon a vital organ of the body." *Com. v. Murray, IV*, 623 Pa. 506, 529 (Pa. 2013) (citing *Com. v. Spell*, 611Pa. 584, 28 A.3d 1274, 1278 (2011)). "That this presumption is a reasonable one founded on human experience is obvious: one does not normally use a deadly weapon on a vital part of another's body unless he intends to kill." *Com. v. O'Searo*, 352 A.2d 30, 37 (Pa. 1976).

Section 903 of the Crimes Code sets forth the crime of conspiracy.

> "(a) Definition of conspiracy. - A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
> > (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
> >
> > (2) agrees to aid such other person or persons in the planning or Commission of such crime or of an attempt or solicitation to commit such crime."

18 Pa.C.S. § 903.

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." *Com. v. Devine*, 26 A.3d 1139, 1147 (Pa.Super.2011). "The conduct of the parties and the circumstances surrounding such conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt." *Id.* The conspiratorial agreement

25

"can be inferred from a variety of circumstances including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Id.*, *Feliciano,* supra at 25–26, *Com. v. Watley,* 2013 PA Super 303, 81 A.3d 108, 115–16 (2013). The "[g]eneral rule of law pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his coconspirators committed in furtherance of the conspiracy. 18 Pa.C.S.A. § 903." *Com. v. Wayne,* 720 A.2d 456, 463-64 (Pa. 1998).

"All co-conspirators to a murder may be found guilty of first-degree murder, regardless of which person actually inflicted the wound which resulted in death." *Com. v. Small,* 741 A.2d 666. 672 (Pa. 1999). See *Com. v. Gibson,* 688 A.2d 1152, 1167-68 (Pa. 1997) (finding that the "Court properly instructed on accomplice liability in prosecution for first degree murder by stating that person is guilty of a crime if he is an accomplice of another person who commits the crime and that he is an accomplice if, with the intent of promoting or facilitating the commission of the crime, he solicits, commands, encourages. or requests the other person to commit it, or he aids, agrees to aid, or attempts to aid the other person in planning or committing."). See *Com. v. Patterson,* 91 A.3d 55, 66-7 (Pa. 2014) (finding that "conviction for first-degree murder as a conspirator was supported by confessed shooter's testimony that he killed victim at request of defendant and another co-conspirator, who told shooter they wanted victim killed because he was a snitch, by evidence that shotgun used in killing had been traded to defendant in exchange for drugs, and by evidence of a series of phone calls in which defendant instructed shooter or other co-conspirator to "take care of" or "deal with" the victim once defendant gave the word. 18 Pa.C.S.A. § 2502(a).").

Viewing the evidence in the light most favorable to the Commonwealth as verdict

26

winner, the Commonwealth presented sufficient evidence to establish that the Defendant conspired with Ken Thomas, Brandon McKelvey, and Christopher Corley to murder the decedent.

The Commonwealth presented evidence from Ken Thomas that the plan to commit this crime was devised by the Defendant. It was the Defendant alone who had a connection to the decedent. Since the decedent knew the Defendant, the Defendant decided that the decedent needed to be killed. Therefore, the Defendant had the specific intent to kill the decedent. Under the doctrine of conspiracy, it matters not whether the Defendant actually fired the gun. It was agreed to by the members of the conspiracy that a killing would be part of their scheme, so as to avoid apprehension because the decedent could identify the Defendant. But for the Defendant's involvement as the principal mastermind in this conspiracy, the kidnapping, robbery, and murder would not have occurred.

The Commonwealth presented corroborative evidence of the defendant's connection to the decedent by way of evidence that the Defendant initially obtained the decedent's phone number by having his sister, Nadirah Alston, ask Ladashe Johnson for it. Ladashe Johnson testified that the Defendant called the decedent on her phone.

The Commonwealth presented evidence that the defendant was part of a conspiracy that involved Corley, McKelvey and Thomas by way of circumstantial evidence obtained from the phone records. The phone attributable to the Defendant made fifteen (15) connections to the decedent's phone between 10:35 a.m. and 2:04 p.m. on the day of the decedent's murder. The phone attributable to the Defendant made twenty-four (24) calls utilizing cell phone towers in the area of the decedent's abduction between 9:43 a.m. and 2:13 p.m. The phone attributable to Christopher Corley was using the same cell phone tower as the Defendant's phone for eleven

27

(11) calls made between 12:11 p.m. and 1:58 p.m. The phone attributable to the Defendant made six (6) calls utilizing cell phone towers in the area of 5600 Newtown Avenue between 4:37 p.m. and 5:44 p.m. on the day of the decedent's murder. At 5:44 p.m. that same phone was using the same cellular phone tower that Brandon McKevley's phone was using at 5:45 p.m. The phone attributable to the Defendant and Ken Thomas' phone were utilizing cell phone towers in the area of 3900 Pennsgrove Street between 6:43 p.m. and 7:26 p.m. that same day. Lastly, the phones attributable to McKelvey, Corley, Thomas, and the Defendant all used the same cell phone tower at 39th Street and Lancaster Avenue, in the area of the 3900 block of Pennsgrove Street, between 6:38 p.m. and 8:04 p.m. All of these locations corroborate Ken Thomas' testimony of the co-conspirators' movements on the day of the decedent's murder.

Based on the foregoing and the reasonable inferences deduced therefrom, the Commonwealth established beyond a reasonable doubt, by both direct and circumstantial evidence that the Defendant was guilty of first degree murder.

## CONCLUSION

Based on the foregoing, the judgment of sentence of the trial court should be affirmed.

By the Court:

Rose Marie DeFino-Nastasi, J.

28

**Commonwealth v. Nysare O'Neil O Alston**
CP-51-CR-0007416-2016
CP-51-CR-0007420-2016
Opinion

## Proof of Service

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P. 114:

Appellant:

Mr. Nysare O'Neil O Alston, JU 5071
SCI Benner Township
301 Institution Drive
Bellefonte, PA 16823

Type of Service:  ( ) Personal  (x) First Class Mail  ( ) Other, Please Specify:

Counsel:

Gary Sanford Server, Esquire
52103 Delaire Landing
Philadelphia, PA 19114

Type of Service:  ( ) Personal  (x) First Class Mail  ( ) Other, Please Specify:

District Attorney:

Philadelphia District Attorney's Office
Appeals Unit
Widener Bldg.
3 South Penn Square
Philadelphia, PA 19107

Type of Service:  ( ) Personal  ( ) First Class Mail  (x) Inter-Office

Date: 06/06/2018

Michael Zaleski
Law Clerk to the Honorable Rose Marie DeFino-Nastasi